**TEXAS DEPARTMENT OF
TRANSPORTATION,**
Petitioner,

v.

**Luke W. ABLE, Ben Dees and George
Hans Knoll, coexecutors of the Estate
of Margaret Able, deceased, Ramona
Lee Dees, and Sylvia Jane Knoll, Re-
spondents.**

No. 99–0108.

Supreme Court of Texas.

Argued Nov. 7, 1999.

Decided July 6, 2000.

Rehearing Overruled Nov. 16, 2000.

Michael C. Ratliff, Grady Click, Linda Eads, Andy Taylor, John Cornyn, Atty. Gen., Austin, for petitioner.

David L. Monroe, John W. Able, Levert J. Able, Able, Monroe & Walker, for respondent.

Justice GONZALES delivered the opinion of the Court, in which Justice ENOCH, Justice BAKER, Justice ABBOTT, Justice HANKINSON and Justice O'NEILL joined.

A jury found that the Texas Department of Transportation (TxDOT) did not negligently cause a fatal automobile accident on a high occupancy vehicle lane. We must decide whether the State has waived sovereign immunity under the Texas Tort Claims Act when a state agency has entered into a joint enterprise with another governmental unit that is found to have negligently caused the accident. The jury

found that there was a joint enterprise and the trial court determined the State waived sovereign immunity. The court of appeals affirmed. 981 S.W.2d 765. We hold that a governmental unit that enters into a joint enterprise can be liable under the waiver of sovereign immunity found in the Tort Claims Act. *See* TEX. CIV. PRAC. & REM.CODE § 101.021(2). Accordingly, we affirm the judgment of the court of appeals.

## I. Background

On the evening of December 7, 1993, Dr. Luke Able and his wife Margaret were traveling in their minivan outbound from Houston, Texas on the U.S. Highway 290 high-occupancy vehicle or HOV lane. The Ables collided head-on with a vehicle driven by Jerry Huebner with its lights off, heading inbound the wrong direction, in the same HOV lane. Both Margaret Able and a passenger in Huebner's vehicle were killed. Dr. Able and Huebner were severely injured. Later that night at the hospital, Huebner gave a statement to Harris County Deputy Sheriff J. Keele about the accident. According to Officer Keele's supplemental accident report, Huebner remembered getting on the HOV lane traveling outbound, turning around in a park-and-ride, proceeding to a traffic light that turned from red to green and then continuing on his way. Huebner stated that this was the last thing he remembered.

Dr. Able, Margaret Able's estate, and Margaret Able's survivors, Ramona Lee Dees and Sylvia Jane Knoll, filed suit against TxDOT, the Houston Metropolitan Transit Authority (Metro), the City of Houston, and Harris County for negligence and gross negligence. The plaintiffs sued the governmental entities individually and as participants in a joint enterprise. They alleged a joint enterprise based on (1) agreements between the governmental entities, including a written agreement between TxDOT and Metro entitled "Transitways Master Operations and Mainte-nance Agreement" (Master Agreement), (2) common law, and (3) various provisions of the Texas Civil Practice and Remedies Code. The plaintiffs non-suited Harris County before trial, and the case proceeded against the three remaining governmental entities.

At trial, the court excluded Huebner's statements in Officer Keele's supplemental accident report. But the jury heard testimony from the plaintiffs' expert on cross examination about the possibility that Huebner intentionally drove the wrong way on the HOV lane on the night of the accident. At the trial's conclusion, the jury was asked to decide which, if any, defendants were negligent and to apportion the percentage of negligence among the defendants. The jury found that (1) Metro and Huebner, who was not a defendant, were negligent, (2) Metro was grossly negligent, (3) TxDOT and the City of Houston were not negligent, and (4) TxDOT and Metro were engaged in a joint enterprise on the date of the accident. The jury apportioned fifty percent of the negligence to Metro and the remaining fifty percent to Huebner.

The jury awarded $1,000,000 to Dr. Able, $750,000 each to Ramona Dees and to Sylvia Knoll for the loss of their mother, and $200,000 to the Estate of Margaret Able. Based on the jury's findings, the trial court rendered a judgment against Metro for $200,000, the maximum award allowed under the Tort Claims Act, and a judgment that the plaintiffs take nothing from the City of Houston and Harris County. The trial court also rendered a judgment against TxDOT for the statutory maximum award of $500,000, based on the jury's finding that TxDOT and Metro were engaged in a joint enterprise. Of this $500,000, the court awarded $250,000 to Dr. Able and $250,000 jointly to Ramona Dees, Sylvia Knoll and the Estate of Margaret Able.

Only TxDOT appealed. In the court of appeals, TxDOT argued that it did not waive its sovereign immunity and that a

judgment could not be rendered against it because the jury found that TxDOT was not negligent. TxDOT further complained that there was no evidence to support the jury's finding that TxDOT and Metro were engaged in a joint enterprise and that the trial court improperly excluded statements by Huebner that resulted in harmful error. The court of appeals overruled all of TxDOT's points of error and affirmed the trial court's judgment. 981 S.W.2d 765. TxDOT petitioned this Court for review, and we granted the petition.

## II. Discussion

 TxDOT makes the same arguments here that it asserted in the court of appeals. We turn first to TxDOT's complaint that there has been no waiver of sovereign immunity in the present case. The general rule is that the State has sovereign immunity unless it has been waived. *See Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex.1998); *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265–66 (Tex. 1980). This immunity applies to both the State and its agencies such as TxDOT. *See Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976); TEX. CIV. PRAC. & REM. CODE § 101.001(2).

### A. Section 101.021

 Section 101.021 of the Texas Civil Practice and Remedies Code provides a limited waiver of sovereign immunity:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE § 101.021. Section 101.021 has been interpreted to waive sovereign immunity in three general areas: "use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property." *Lowe*, 540 S.W.2d at 298. The plaintiffs and TxDOT agree that subsection (1) of section 101.021 does not apply to this case. Therefore, the only issue before this Court involving waiver of sovereign immunity is the interpretation of subsection (2) of section 101.021.

TxDOT argues that the "so caused" language of subsection (2) allows liability only for the negligence or wrongful acts or omissions caused by its own employees. TxDOT cites this Court's construction of the "so caused" language, used in a prior version of section 101.021, to mean "when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office." *Lowe*, 540 S.W.2d at 299; *accord Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 33 (Tex.1983) (interpreting "so caused" to mean that "[t]he proximate cause of the damages for death or personal injury must be the negligence or wrongful act or omission of the officer or employee acting within the scope of his employment or office."). Because the jury found no negligence by TxDOT or its employees here, TxDOT asserts it cannot be liable as a matter of law under section 101.021(2).

Furthermore, TxDOT argues it cannot be liable for the negligent acts of Metro's employees. The Tort Claims Act defines employee as:

a person, including an officer or agent, who is in the paid service of a govern-

mental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

TEX. CIV. PRAC. & REM.CODE § 101.001(1). TxDOT contends that under this definition, Metro employees are not employees of TxDOT for purposes of section 101.021(2); accordingly, TxDOT cannot be vicariously liable for Metro's negligence.

■ We disagree with TxDOT's interpretation of the "so caused" language in section 101.021(2). This Court has previously held that liability under subsection (2) can arise under different theories:

> [S]ubsection 2 is broader than subsection 1 in that it encompasses governmental liability based on respondeat superior for misuse of tangible personal property other than motor-driven vehicles and equipment. Subsection 2 is also broader because it encompasses governmental liability for a *condition* of real property or tangible personal property. Thus, in addition to liability based on principles of respondeat superior, subsection 2 includes governmental liability for premise defects.

*DeWitt v. Harris County,* 904 S.W.2d 650, 653 (Tex.1995). These theories of liability are based on different standards of care owed—some of which are not dependent upon the actions of any employee. Thus, we have stated that the limiting language in subsection (1)(b), requiring the employee to be personally liable to the claimant under Texas law, would be inapposite in the context of subsection (2). *See DeWitt,* 904 S.W.2d at 654.

In this case, plaintiffs alleged a premises defect involving a state highway. Further, the jury charge, asking the jury to decide whether any defendants were negligent, tracked the elements that must be found in a premises defect case. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998) (describing the four ele-

ments of a premises defect claim). In *DeWitt* we noted that in a premises defect suit against a governmental unit under section 101.021, liability is not based on the actions of the governmental unit's employees:

> With premise defects, liability is predicated not upon the actions of the governmental unit's employees but by reference to the duty of care owed by the governmental unit to the claimant for premise and special defects as specified in section 101.022 of the Texas Tort Claims Act.

*DeWitt,* 904 S.W.2d at 653. Instead, in a premises defect case the State owes the same duty a private landowner owes a licensee. *See* TEX. CIV. PRAC. & REM.CODE § 101.022(a); *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992); *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974). Here the jury found Metro negligent for a premises defect. This liability was not based upon the conduct of their employees but instead upon the standard of care owed for a premises defect. *See* TEX. CIV. PRAC. & REM.CODE § 101.022(a). Thus, contrary to TxDOT's argument, liability for premises defects under section 101.021(2) does not depend on the actions of its employees.

But even if a governmental unit can be liable under section 101.021(2) without a finding of negligence by its employees, we must still consider TxDOT's argument that it cannot be liable here because of the jury's finding that TxDOT was not negligent for a premises defect. The jury found such liability based on a joint enterprise between Metro and TxDOT. We now consider whether a governmental unit can be liable for a premises defect solely under a joint enterprise theory.

### B. Waiver of Sovereign Immunity

■ We turn first to the plain meaning of section 101.021(2). That section clearly states a governmental unit can be liable for "personal injury and death so caused

by a condition ... of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM.CODE § 101.021(2). Here the trial court found a waiver of sovereign immunity because of the jury's finding that there was a joint enterprise. Because the jury found that TxDOT was not individually negligent for a premises defect, TxDOT can only be liable if the joint enterprise finding brings the liability within the waiver of sovereign immunity language in the Tort Claims Act. Section 101.021(2) waives liability for a governmental unit if "the governmental unit would, were it a private person, be liable to the claimant according to Texas law." We have stated in the context of private parties that "the theory of joint enterprise is to make each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 14 (Tex.1974). If there is a joint enterprise here between Metro and TxDOT, and if TxDOT would have been liable for Metro's negligence had TxDOT been a private person, then we must conclude that the State has waived its immunity and that TxDOT is liable under the plain meaning of section 101.021(2).

## C. Joint Enterprise

 Joint enterprise liability makes "each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." *Shoemaker*, 513 S.W.2d at 14. In *Shoemaker* we adopted the definition of joint enterprise as stated in section 491, comment c of the *Restatement of Torts*. That section states:

> [t]he elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal

right to a voice in the direction of the enterprise, which gives an equal right of control.

RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965); *see also Blount v. Bordens Inc.*, 910 S.W.2d 931, 933 (Tex.1995); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex.1995).

In this case the charge asked the jury whether, on the occasion in question, any of the defendants were engaged in a joint enterprise. The charge defined joint enterprise, tracking the four elements that Texas law requires in order to prove a joint enterprise. Relying upon that definition, the jury found that TxDOT and Metro were engaged in a joint enterprise. TxDOT challenges the finding, however, complaining that there is no evidence of a community of pecuniary interest and an equal right to control the enterprise.

 We will uphold the jury's findings if there is more than a scintilla of evidence to support them. *See General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999); *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). We turn first to whether there is any evidence that a community of pecuniary interest existed between TxDOT and Metro. In *Shoemaker*, we noted that some Texas courts had manifested a broad view of joint enterprise beyond a commercial or business purpose. But we also noted that other courts had limited joint enterprise to the business context: "[w]hile several courts have embraced the 'community of pecuniary interest' element set forth in the Restatement, others have articulated this element in terms such as a 'common business purpose,' a 'common financial interest,' a 'common pecuniary objective,' or a 'venture for profit in a financial or commercial sense.'" *Shoemaker*, 513 S.W.2d at 17 (citations omitted). Thus we concluded there that, "there is not the same reason for imposing liability in the non-commercial situations which are more often matters for friendly or family cooperation and accommodation." *Shoemaker*,

513 S.W.2d at 17. We therefore limited the application of joint enterprise to those having a business or pecuniary interest. See Shoemaker, 513 S.W.2d at 17.

In a more recent case, we held that two men who were killed in a car accident while driving to New Mexico to pick up horses owned by one man's father and a family friend were not involved in a joint enterprise. See Blount v. Bordens, Inc., 910 S.W.2d 931, 932 (Tex.1995) (per curiam). The only evidence that the defense offered in that case to prove a community of pecuniary interest was the testimony of one man's father that his son would be able to pay some bills after returning from the trip. See Blount, 910 S.W.2d at 933. We held that this meager circumstantial evidence could give rise to any number of inferences, and amounted to no evidence of a community of pecuniary interest. See Blount, 910 S.W.2d at 933.

In this case, however, TxDOT and Metro entered into the Master Agreement. Under the subheading "Use of Facilities" the agreement acknowledges that:

> the highway facilities upon which Transitways are constructed are under the ultimate control and supervision of the State, however, the parties also acknowledge that the construction, operation, and maintenance of Transitways *involve the investment of substantial sums for mass transit purposes,* by METRO and the United States Government; therefore, the State agrees that it will exercise its rights of control and supervision so as to recognize the mass transit purposes of Transitways throughout their useful lifetime.

(emphasis added). Further, plaintiffs introduced at trial a Metro document that states the Transitways program has been a joint effort between TxDOT and Metro that has used federal, state and local funds. These documents provide some evidence that show Metro and TxDOT had a community of pecuniary interest in the purpose of this joint undertaking. The Master Agreement plainly recognizes that the Transitways project involved substantial sums of money and contemplated a sharing of resources in order to make better use of this money. It may well have been that the monetary and personnel savings produced from this pooling of resources was substantial. The documents also clearly contemplate an economic gain that could be realized by undertaking the activities in this manner. The Transitways project was not a matter of "friendly or family cooperation and accommodation" but was instead a transaction by two parties that had a community of pecuniary interest in the purpose. See Shoemaker, 513 S.W.2d at 17. We conclude that the evidence produced at trial is some evidence from which the jury could find that TxDOT and Metro were engaged in a community of pecuniary interest in the purpose of the joint enterprise.

■ TxDOT also complains that there is no evidence to support the jury's conclusion that there was an equal right to control the enterprise. In *Shoemaker* we stated that the equal-right-to-control element means "that each [participant] must have an authoritative voice or, ... must have some voice and right to be heard." *Shoemaker*, 513 S.W.2d at 16.

This court has further looked at the equal right to control prong in *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716 (Tex.1995). In *Triplex,* one issue, among others, was whether a radio station could be held liable under theories of joint enterprise for personal injuries resulting from a nightclub's violations of the Texas Dram Shop Act. The plaintiff's evidence showed that the nightclub ran a promotion pricing drinks on the night of the injuries to correspond to the radio station's FM frequency. It was the nightclub, however, that was licensed to sell the alcohol, controlled how much liquor was served and to whom it was served, decided who to admit and eject from the club and was in the best position to monitor the amount of liquor that the patrons consumed. See *Triplex,* 900 S.W.2d at 719.

Further, there was no evidence that the radio station had any contractual right to control or exercised any control over who was served, admitted or rejected. *See Triplex*, 900 S.W.2d at 719. We held that this amounted to no evidence of an equal right to direct and control the enterprise sufficient to justify the imposition of joint enterprise liability. *See Triplex*, 900 S.W.2d at 719.

Unlike *Triplex*, in which there was no contractual right to control, in this case TxDOT and Metro enjoy contractual rights under the Master Agreement. That agreement states, "while METRO is the primary agency responsible for the day-to-day operation and maintenance of Transitways, such Transitways, being part of the controlled-access highways, impact freeway operation and the State therefore has an interest and responsibility in the operation and maintenance of Transitways." The Master Agreement, under the subheading "Use of Facilities," also acknowledges that "the highway facilities upon which Transitways are constructed are under the ultimate control and supervision of the State, however, ... the State agrees that it will exercise its rights of control and supervision so as to recognize the mass transit purposes of Transitways throughout their useful lifetime."

TxDOT argues that the Master Agreement gave Metro ultimate day-to-day control of the HOV traffic. Under the subheading "Maintenance of Transitways" the Master Agreement provides for TxDOT and Metro to "divide the responsibility for maintenance" of the Transitways. The paragraphs that follow provide that Metro will maintain numerous items of the Transitways, including the signs, control devices, equipment, and illumination devices. Metro also agreed to maintain all park-and-ride or transit center facilities, including the pavement, striping, lighting, signing, buildings, sanitary facilities, water, storm sewers, detention ponds and facilities, telephones, utilities, signals and landscaping. A later provision of the Master

Agreement states that the Metro Transit Police would assist in the opening and closing of the lanes as specified in the Master Agreement. TxDOT argues that these provisions show that Metro had the sole control over the enterprise and that there is no evidence that TxDOT had an equal right to control in the enterprise.

In essence, TxDOT invites this Court to redefine the scope of its enterprise with Metro by excluding the day-to-day maintenance and operation of the Transitways, a duty that TxDOT claims belonged to Metro. We decline the invitation for two reasons. First, allowing a member of a joint enterprise to escape liability to a third party simply by delegating responsibility for the component of the joint enterprise that caused the injury to the third party would defeat the theory of joint enterprise liability. Second, other provisions in the Master Agreement contradict TxDOT's suggestion that it did not have control over the maintenance and operation of the Transitways. While the Master Agreement provides that Metro is the primary agency responsible for the day-to-day operation and maintenance of the Transitways, the agreement also clearly provides that the State, through TxDOT, has an interest and responsibility in the operation and maintenance of the Transitways. Additionally, under the subheading "Operation of Transitways" the agreement provides that TxDOT, through the State Transitway Engineer, and Metro, through the Transitway Manager, were to serve on the "Transitway Management Team." This team was to meet monthly to:

> oversee Transitway Operations; monitor policies and procedures promulgated by Operations Plans; interpret and implement the terms of Operations Plans; and review Transitway operating procedures, rules and regulations established pursuant to Operations Plans. On a semi-annual basis, they shall submit a report to METRO's General Manager and the State's District 12 Engineer concerning such matters as Transitway

vehicle and passenger usage, operating speeds, accident and incident data, and other matters pertaining to the safe and effective operations of Transitways. The reports may also include recommendations for design modifications of existing Transitways and suggestions regarding the design of future Transitways.

Further, Metro and TxDOT had to promulgate an Operations Plan for each Transitway not less than thirty days prior to the commencement of operations on any segment of the Transitway, and file the Operations Plan with both agencies. Amendments to the Operations Plan could be made only by the consent of both TxDOT and Metro. The Transitway Management Team also developed the Transitway rules and regulations in order to assure safe and effective operation and procedures to be implemented by agency personnel as well as the Transitways' hours of operation. The team also evaluated the effectiveness of the Transitway traffic control devices and recommended changes needed to further the goals of the Master Agreement. Thus, even though Metro employees carried out the procedures of the Transitway Management Team, TxDOT had an equal right to control what those procedures were and how they were to be carried out. In other words, TxDOT had a voice and right to be heard regarding matters affecting the day-to-day operations of the Transitways.

This is some evidence to support the jury's finding that TxDOT and Metro had the mutual right to control the direction and management of the enterprise. Accordingly, we hold that there is legally sufficient evidence to support the jury's finding that a joint enterprise existed between TxDOT and Metro. Because each party in a joint enterprise is responsible for the negligent act of the other, we conclude that the State has waived immunity and TxDOT is liable for Metro's negligence under the plain meaning of section 101.021(2).

The Legislature plainly intended the State to waive sovereign immunity if a governmental unit would, were it a private person, be liable to the claimant according to Texas law. This waiver is clear and unequivocal, and makes no exception for joint enterprise liability. *See City of La-Porte v. Barfield,* 898 S.W.2d 288, 291 (Tex.1995) (noting that the Legislature must waive sovereign immunity with clear and unambiguous language). We conclude from the statute's plain meaning that the Legislature intended that a governmental unit enjoying the benefits and advantages of a joint enterprise would also be subject to the same obligations and liabilities that a private person would be if he or she were engaged in a joint enterprise.

### III. Exclusion of Evidence

■ On the night of the accident, Officer Keele was dispatched to the hospital to take statements from both drivers, Huebner and Dr. Able. TxDOT argues that the trial court erred in excluding Huebner's statements to Officer Keele. During this questioning, Huebner made statements that Officer Keele later included in his supplemental accident report:

at first … he [Huebner] did not remember being on the HOV Lane but remembered being on the feeder road of U.S. 290. He then stated that he remembered getting on the HOV Lane at Pinemont park and ride and then going [westbound or outbound] in the HOV Lane and getting off at [West] Little York park and ride and as he was attempting to exit the park and ride he came to a traffic control gate and there was a traffic light on it that was red and he stopped and then he pulled his vehicle a little closer and the light turned green and he started to proceed but did not remember anything after that.

TxDOT contends that this evidence was admissible for three reasons. First, it was a prior inconsistent statement and therefore admissible under Rule 613(a) of the Texas Rules of Civil Evidence because Hu-

ebner later testified at trial that he remembered driving outbound on the main lanes of U.S. 290 instead of on the HOV lane. Second, the excluded statement was admissible because it challenged the opinion testimony of Dr. Stephen Able, who was an expert witness for the plaintiffs. Third, the statement was admissible as a public record under Rule 803(8) of the Texas Rules of Civil Evidence.

■■■■ The inclusion and exclusion of evidence is committed to the trial court's sound discretion. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex. 1995). But even if we assume, for purposes of this decision, that the statement was admissible under 803(8) as an exception to the hearsay rule, and that trial court erred in not admitting it, TxDOT still must show that the error was harmful. *See* TEX.R.APP. P. 61.1. To put it another way, a successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *See Alvarado,* 897 S.W.2d at 754. TxDOT asserts that the excluded statement probably caused the rendition of an improper verdict because it was vital evidence that probably would have convinced the jury that Huebner intentionally drove the wrong way on the HOV lane on the night of the accident. Further, TxDOT contends the statement probably would have resulted in a jury finding that it was Huebner's sole negligence that proximately caused the accident.

■■■■ In determining if the excluded evidence probably resulted in the rendition of an improper judgment, a court must review the entire record. *See McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). This court ordinarily will not reverse a judgment for erroneous rulings on admissibility of evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *See Gee,* 765 S.W.2d at 396; *Reina v. General Acci-*

*dent Fire & Life Assurance Corp.,* 611 S.W.2d 415, 417 (Tex.1981). In this case, the jury heard evidence that Huebner might have driven outbound on the HOV lane and then shortly thereafter driven inbound on the same HOV lane, implying that he should have known he was traveling against the traffic. The jury also heard evidence that Huebner was familiar with the HOV facilities and might have intentionally ignored ramp controls.

In TxDOT's cross examination of Dr. Olin K. Dart, Jr., the plaintiffs' expert consulting traffic engineer, Dr. Dart stated that it was possible that Huebner was familiar with the Pinemont park-and-ride and that he deliberately disregarded ramp controls in entering the HOV lane heading inbound, against the flow of the HOV traffic.

Q. It was your conclusion, sir, in both of your reports, that one of the possibilities for Jerry Huebner entering the HOV lane going the wrong way is that he deliberately disregarded ramp controls; is that right?

A. That's entirely possible, yes, sir.

. . . .

Q. One of the possibilities that you considered, Doctor, did you consider the possibility that Jerry could have initially gone outbound from Pinemont to West Little York and then turned around and come back inbound?

A. That was in one of his statements, I believe, that's correct.

Q. Yes, sir. In fact, you know that Jerry Huebner lives in the Pinemont area, don't you?

A. That's what he said.

Q. And you know that Jerry Huebner is familiar with this park and ride lot?

A. Apparently so.

Q. Lived in that area for years?

A. Yes.

TxDOT's counsel then established that Dr. Dart had read and reviewed Huebner's depositions, and again asked about the possibility that Huebner had proceeded outbound on the HOV lane and then turned around and immediately proceeded back inbound on the same HOV lane.

Q. So one possibility is he [Huebner] went outbound from Pinemont to West Little York and then came back inbound; is that correct?

A. That would be a possibility.

Q. Within a matter of a few minutes?

A. That would be possible.

. . . .

Q. Okay. And if Jerry Huebner, in fact, was going both ways on this HOV lane within a matter of minutes, there was no excuse for him having done that, is there, Doctor?

. . . .

Q. (By Mr. Garza) If, in fact, he did that?

A. If, in fact, he did that. You would think that he would have understood that.

Q. There would be no excuse for him having done that, would there?

A. That's correct.

. . . .

Q. All right. And so, Doctor, if he intentionally got on this HOV lane knowing that at 10:00 o'clock at night, knowing that at 10:00 o'clock at night, that HOV lane could only be used for outbound traffic and he intentionally got on it inbound, there is no excuse for him having done that, is there?

A. That's correct.

. . . .

Q. Let's go through some of this evidence that we've discussed today, Doctor. Although, as you tell us today, you have no more idea about how Jerry got on that HOV going the wrong way than anyone else, do you?

A. That's right.

Q. Even after readings [sic] Jerry's so-called sworn testimony about how he now claims it happened, right?

A. He claims he went in through the gate.

Q. Yes, sir. That's what he claims, right?

A. That's right.

Q. And he has given inconsistent stories at different times, hasn't he?

A. Apparently.

Q. Yes, sir. One of which has included an admission that he went both ways on an HOV lane within a few minutes?

Based on the record, we conclude Huebner's statement to Officer Keele made on the night of the accident, was merely cumulative of the evidence already in the record and was not controlling on a material issue dispositive to the case. TxDOT has failed to show that the excluded evidence probably caused the rendition of an improper judgment. Thus we conclude the trial court's ruling, even if erroneous, did not amount to harmful error.

## IV. Conclusion

For the reasons considered above, we hold that there is sufficient evidence to support the jury's finding that TxDOT and Metro were engaged in a joint enterprise and that the State has waived immunity under section 101.021 of the Tort Claims Act. We also hold that it was not harmful error to exclude Huebner's statements to Officer Keele. Because of our disposition we need not address the cross points of error brought by plaintiffs in the court of appeals. Accordingly we affirm the judgment of the court of appeals.

Justice OWEN filed a dissenting opinion, in which Chief Justice PHILLIPS and Justice HECHT joined.

Justice OWEN, joined by Chief Justice PHILLIPS and Justice HECHT, dissenting.

I cannot join in the Court's opinion or judgment because it is based on the premise that vicarious liability can be imposed on the State of Texas for the negligence of one of its political subdivisions under the common-law theory of joint enterprise. There are two elements of a tort cause of action based on joint enterprise that are not satisfied by the relationship between the State and its political subdivisions when they are providing core governmental functions. One of those elements is that the members of a group must have an equal voice in the direction of the enterprise which gives rise to an equal right of control. The other is that there must be a common pecuniary interest in a commercial setting. Neither of those elements exists when the State is sued for the negligence of a state-created transit authority in carrying out day-to-day operations of a highway that runs through a city.

Because the jury in this case failed to find the State negligent and because joint enterprise is not a viable basis for imposing vicarious liability on the State for the negligence of its political subdivision, I must dissent.

## I

The jury in this case was asked to determine whether the State's negligence proximately caused the accident in question and whether Metro's negligence proximately caused the accident. The jury answered "no" with regard to the State, but "yes" as to Metro. Thus, the State's direct negligence was submitted to the jury. The Respondents, to whom I will refer collectively as the Ables, failed to obtain a finding that the State was negligent for its role in operating and maintaining the Highway 290 HOV lane.

The Ables nevertheless contend that Metro's negligence should be imputed to the State because, they claim, the State and Metro were engaged in a joint enter-prise. A joint enterprise necessarily assumes that there are two or more individuals or distinct entities that are members of a group. This Court held in *Shoemaker v. Estate of Whistler* that one of the elements of joint enterprise is that there is an agreement, express or implied, "among the members of the group." 513 S.W.2d 10, 16 (Tex.1974). Although Metro and the State are distinct in the eyes of the law for some purposes, just as a subsidiary corporation is distinct from its parent corporation in the eyes of the law for most purposes, Metro is part of the State itself. It is a political subdivision of the State. *See Metropolitan Transit Auth. v. Plessner*, 682 S.W.2d 650, 651 (Tex.App.—Houston [1 st Dist.] 1984, no writ).

One element of a tort cause of action based on joint enterprise is that the members of the group must have "an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Shoemaker*, 513 S.W.2d at 17. The State has a superior right of control over its political subdivisions. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 72 (Tex.2000) (stating that a city "derives its existence and powers from legislative enactments and is subject to legislative control"). Indeed, the Operations and Maintenance Agreement between the State and Metro expressly recognizes that the State had the ultimate control of the HOV lane on which the Ables were injured. The Operations and Maintenance Agreement provides in its recitals that the "controlled-access highways ... are under the ultimate control and supervision of the State." Similarly, the Agreement provides in a paragraph entitled "Use of Facilities" that "the highway facilities upon which Transit-ways are constructed are under the ultimate control and supervision of the State." This Court made clear in *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716 (Tex.1995), that even when two separate entities have a common pecuniary interest in a jointly sponsored event, there cannot be a joint venture if one party has a supe-

rior right of control. In that case, the Court stressed no less than three times that the right to control was not equal. *See id.* at 718–19. The Court held in *Triplex* that the owner of a bar had a greater right of control over the serving of alcohol than the radio station that highly publicized and co-sponsored "Ladies Night" at the bar. *Id.*

In the case before us today, the jury has decided that the State, which had the superior right of control, was not liable, but that Metro, which had some right of control but not an equal one, was negligent. The overlay of joint venture liability does not fit the facts of this case.

## II

Another element of a joint venture that is absent in this case is a pecuniary interest in the common purpose of a venture. Over twenty-five years ago, this Court reassessed the requirements for establishing a joint enterprise in the common-law tort context. *See Shoemaker*, 513 S.W.2d at 10. We disavowed earlier decisions that had held that a joint enterprise could be established merely by a showing that there was joint ownership of an instrumentality or property involved in an injury. *See id.* at 16–17. We also disavowed earlier decisions that had imposed liability when there was no pecuniary interest in the common purpose. *See id.* The Court stressed in *Shoemaker* that tort liability for a joint venture would henceforth arise only in *commercial* situations. *Id.* at 17. Providing, operating, and maintaining public highways is not a commercial enterprise.

In *Shoemaker*, two owners of an aircraft along with two passengers perished when the plane crashed during a voluntary search and rescue mission. *Id.* at 11–12. This Court held that although the two owners had "a joint interest in the purposes of the enterprise and an equal right of control," that was not enough to impute the negligence of the pilot-owner to the passenger-owner. *Id.* A pecuniary inter-

est *in the purpose of the enterprise* was lacking. *See id.*

In the case before the Court today, the purpose of the Operations and Maintenance Agreement is to provide streets and highways for the citizens of Houston and of this state. While the State and Metro spend millions of dollars providing that service, they have no pecuniary interest in the purpose of the enterprise. They do not provide the service in order to benefit financially. They are providing a core governmental function. Their public service is no different from the public service that was at issue in *Shoemaker*, which was a civil air patrol. *Id.* at 12.

\* \* \* \* \*

Because Metro is a political subdivision of the State, because there is not an equal right of control, and because the State has no pecuniary interest in the purpose of providing, operating, and maintaining public highways, the State should not be vicariously liable under a joint venture theory. Accordingly, I dissent.