COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| SHEILA ARTHUR and DAVID MAGIERA, | § | No. 08-07-00040-CV |
|  | § | Appeal from |
| Appellants, | § | 112th District Court |
| v. | § | of Crockett County, Texas |
| JANET LYN GRIMMETT, | § | (TC # 02-09-06507) |
| Appellee. | § |  |

## O P I N I O N

This is the tragic story of a private airplane crash in Ozona, Texas, on October 19, 2001. The cause of the accident is undisputed. Stated bluntly, the Piper PA-30 Twin Comanche simply ran out of gas or, as phrased by the expert witnesses, the crash occurred as the result of "fuel starvation." Two passengers, Janet Lyn Grimmett, and her boyfriend, Dennis Otts, filed suit against the pilot, John Willison; the owner, Sheila Arthur; Arthur's husband, David Magiera; and Magiera's business entity, Dove Homes, L.L.C. Following a two-week trial, the jury returned a verdict in favor of the plaintiffs for $14,266,238.75. Arthur and Magiera have appealed. Because we conclude that the evidence is legally insufficient to support either theory of Grimmett's recovery, we reverse and render.

## FACTUAL SUMMARY

We begin by examining the individual actors and the relationships that existed between them. Sheila Arthur is a former executive secretary who is married to David Magiera. At the time of the events involved here, Arthur was involved in an Internet-based ministry. Magiera is an artist, sculptor, and website designer. Through their church, the couple had become friends with John

Willison, a pilot. The three of them also became friends with Jose Hernandez, a young man from El Salvador. Hernandez found work in Texas as a framer and ultimately started a subcontracting framing business operated as JOH Construction. This company employed up to eighty workers engaged in construction contracts throughout the United States.

Magiera and Hernandez came up with the idea of entering business together as home builders. They incorporated Dove Homes, L.L.C. in June 2001 as a limited liability corporation, with each man owning fifty percent of the company. They agreed that Magiera would act as the sales and promotion arm of the company while Hernandez handled the construction end of the business. Their intent was to build houses in Irving, Texas, where Magiera and Arthur lived. Hernandez and his family lived in nearby Fort Worth.

Throughout the late summer and early fall of 2001, Hernandez worked on a construction contract at a golf resort in Lajitas, Texas, which is an eleven hour drive from Fort Worth. On five or six occasions, Hernandez leased a private airplane to fly home for the weekend to visit his family. On at least one of these occasions, Willison piloted the plane. Hernandez and Willison then began discussing the purchase of an airplane to facilitate the business travel. Although Hernandez had sufficient income to afford payments and expenses related to owning a plane, neither he nor Willison had the credit necessary to obtain financing. Willison then talked to Magiera about buying an airplane. And so the plan unfolded. Because Arthur had the necessary credit, she would be the owner in name only. Hernandez would be the owner-in-fact. Arthur would arrange the loan and Hernandez would make the payments, including maintenance expenses. To protect Arthur's credit, Hernandez would make the payments to her and she in turn would pay the lender. After the note was repaid, Arthur would transfer title to Hernandez.

The aircraft would enable Hernandez to fly between Lajitas and the Dallas-Fort Worth

metroplex both to visit his family and to begin construction projects through Dove Homes. For Arthur and Magiera, the plan would allow them to travel for leisure; it would also further the business of Dove Homes. Willison would pilot the plane, for free, in return for the ability to use it in his wallpaper business as well as for his own personal reasons. Because he hoped to obtain an ownership interest, Willison wanted to "work off" his part of the down payment by flying the plane. All parties agree there was never an intent to operate the aircraft for profit or for charter. The attorneys apparently all agreed that this arrangement was "loosey-goosey."

There is some evidence in the record of a hierarchy or pecking order of use. Hernandez was to have access to the plane when he needed it. Arthur and Magiera would use the plane if Hernandez weren't using it, and Willison could use the plane when no one else was using it.

Within a couple of weeks, the four friends decided to move forward with their plan. Willison began looking at planes and reporting to the others. Willison found the Piper PA-30 Twin Comanche on the Internet and Arthur authorized him to purchase the plane for $90,000. Willison booked a commercial flight to South Carolina to inspect the plane and he negotiated the purchase on everyone's behalf. Hernandez put up the down payment of $10,000 and Arthur signed a promissory note for the balance. The purchase was completed on October 18, 2001, and the airplane was registered in Arthur's name. Willison then flew the plane to Meacham Field at Fort Worth where it was to be hangared. At the time of the purchase, Hernandez was in Lajitas.

The very next day, Hernandez called Magiera and asked him to call Willison. Hernandez wanted Willison to fly to Lajitas, pick him up, and fly him back to Fort Worth. Magiera relayed the message to Willison and arranged to meet him at Meacham Field. Magiera wanted to fly with Willison to Hicks Field in Dallas to try out their new plane. Willison took on fuel at Hicks and Magiera paid for it with Arthur's credit card. Hernandez later reimbursed Arthur for the fuel. At

this point, Willison flew to Addison Airport to pick up an electrician and his family who Hernandez wanted flown to Lajitas. Willison did not purchase fuel at Addison. He then flew to Lajitas where he dropped off these passengers and picked up Hernandez, Otts and Grimmett. Otts was a contractor/friend of Hernandez and Grimmett was Otts' girlfriend. Neither Magiera nor Arthur knew there would be additional passengers on the flight.

Willison planned to fly from Lajitas to San Angelo to refuel because the Lajitas airport had no fuel service. At some point after takeoff, Willison realized that there was probably less fuel than he had calculated prior to take-off. He decided to divert to Ozona, where there was a lighted airstrip and available fuel. By this time it was dark and Willison had difficulty locating the air field. Before he could find the runway, the plane crash-landed. All of the passengers survived, but Grimmett suffered catastrophic injuries.

## PROCEDURAL SUMMARY

In their original petition, Janet Grimmett and David Otts sued Crockett County, Charles McCleary d/b/a McCleary Aircraft, Dove Homes, L.L.C., and the pilot, John Willison. They later amended their petition to add as defendants the owners of Dove Homes, Sheila Arthur and David Magiera. Otts entered into a settlement and his cause of action was severed. Upon deciding that neither Crockett County nor Charles McCleary bore any fault in the accident,[1] Grimmett dismissed her claims against them. During trial, Judge Brock Jones granted a directed verdict as to Dove Homes.

## THE CAUSES OF ACTION AND THE VERDICT

---

[1] Willison claimed that neither the airport beacon nor the runway lights were illuminated on the night of the crash, causing the plaintiffs to originally sue Crockett County and Charles McCleary, the manager of the airport. Testimony by witnesses and the pilot of a plane who landed earlier in the evening convinced the plaintiffs that the lights were indeed functioning.

Grimmett pursued six theories of recovery against Willison, Arthur and Magiera which were submitted to the jury.  Question One submitted negligence.  The jury found that Willison was negligent, but that neither Arthur nor Magiera were negligent.[2]  It did not answer Question Two, which would have apportioned fault among the defendants.  Questions Three and Four inquired whether Willison was Arthur's employee or agent.  The jury answered both of these in the negative.  By its answer to Question Five, the jury found that Willison, Arthur, and Magiera were engaged in a joint enterprise.  And in response to Question Six, the jury determined that Willison, Arthur, and Magiera were engaged in a joint venture.

## THE ISSUES ON APPEAL

Arthur and Magiera bring seven and six issues for review, respectively.  The issues are for the most part identical, but the order in which they are presented is not.  Both parties complain that the evidence is legally and factually insufficient to support the jury's findings of joint enterprise and joint venture.  Alternatively, they contend that a fatal conflict exists by virtue of the jury's negative findings on employee/agency and its affirmative findings on joint enterprise and joint venture.  Arthur maintains that the judgment improperly imposes individual liability against her.  Finally, Appellants allege that the jury's liability findings should be disregarded as a matter of law by virtue of 45 U.S.C. § 44112 of the Federal Aviation Act.  We begin with a review of the sufficiency of the evidence.

## STANDARDS OF REVIEW

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding.  *Serrano v. Union Planters Bank*,

---

[2]  The theory behind the negligence claims against Arthur and Magiera was negligent entrustment.  The jury was instructed that "negligence" when used with respect to the couple's conduct "means entrusting an airplane to a reckless or incompetent pilot if the entrustor knew or should have known that the pilot was reckless or incompetent."

N.A., 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). There are two separate "no evidence" claims. *Id*. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." *Id*. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id*.; *In re Estate of Livingston*, 999 S.W.2d 874, 876 (Tex.App.--El Paso 1999, no pet.).

An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long as more than one inference is possible. *Id*. at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id*. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id*. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then

the trier of fact must be allowed to do so. *Id*. at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *Id*. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id*. at 827.

In reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual sufficiency of an adverse finding on an issue on which the opposing party has the burden of proof, we should set aside the verdict only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We are not permitted to substitute our judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Further, we bear in mind that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

## JOINT ENTERPRISE

The essential elements of a joint enterprise are (1) an express or implied agreement among the members of the group, (2) a common purpose to be carried out by the group, (3) a community of pecuniary interest in that purpose, and (4) an equal voice in the direction of the enterprise, which gives an equal right of control. *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995); *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 16-17 (Tex. 1974); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 850 (Tex.App.--Fort Worth 2006, no pet.). Arthur and Magiera concede there is some evidence to support an agreement between the parties. They do, however, challenge the sufficiency of the evidence to support the remaining three elements.

**Common Purpose**

As Arthur and Magiera describe the evidence, the only common purpose among members of the group was "to buy and use an aircraft." While each member wanted to buy the plane and use it, Arthur and Magiera contend that each individual's contemplated use of the plane was distinct in nature--"in other words, it is not a common purpose **to be carried out by the group.**" [Emphasis in Appellants' briefing].[3] They point out:

• that Arthur never intended to own the airplane ultimately;

• that Magiera was neither an owner in name nor in fact;

• that Arthur and Magiera had no agreement with Willison as to his ownership rights;

• that Willison's use of the plane was not a common purpose for Arthur or Magiera;

• that each person had his or her own reason for using the plane;

• that Arthur and Magiera wanted to use it for personal travel; and

• that Willison could use it only when no one else was.

Grimmett responds that the enterprise was joined to ensure that the parties were able to afford, pay for, hangar, and utilize an airplane. They intended to reduce the cost of chartering a plane, which generally costs $150 per hour. By pooling their resources, Hernandez could pursue contracts with JOH Construction as well as profit through Dove Homes. Magiera and Arthur also wanted Dove Homes to be profitable. Willison could use the plane in connection with his own business needs.

We conclude that the evidence is both legally and factually sufficient to establish a common purpose. Our analysis is informed by *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10 (Tex. 1974). *Shoemaker* is eerily familiar to the case at bar. Wylie Shoemaker filed suit for damages arising from

---

[3] We pause here to specify precisely which individuals were identified as members of the group. The jury was instructed that they were to consider only whether Willison, Arthur, and Magiera were engaged in a joint enterprise. Hernandez was not included. Nothing in the record indicates that he was ever a party to the lawsuit.

the death of his son in the crash of a private airplane in Sanderson, Texas. The aircraft was owned by five gentlemen, two of whom were on board the plane at the time. The two owner/occupants, Clyde Whistler and C.D. Carroll, were both pilots. They and their two passengers died in the crash. By the time of trial, only the estate of Clyde Whistler remained as a defendant. A jury determined the pilot to have been negligent, although no one could determine whether Whistler or Carroll had been in the command seat since all of the occupants were ejected. The trial court entered judgment against Whistler's estate and against his widow. This court of appeals reversed and rendered judgment that Shoemaker take nothing, and he appealed.

The Supreme Court found three bases upon which liability could be imposed against a joint owner: (1) that Whistler was in actual control of the airplane; (2) that whether or not he was in actual control, he was chargeable as an active participant in the negligence of taking off in bad weather; and (3) that negligence could be imputed to Whistler under the Texas doctrine of joint enterprise, regardless of whether he was in active command of the airplane or an active participant at take-off. Discounting the first two theories, the Supreme Court reached the question of joint enterprise. Tracing the history of the doctrine, the court noted that the law of partnership and the principles of agency serve as the foundation for joint enterprise. *Id.* at 16.

> A step away from partnership is joint venture, a concept that is generally more limited in time and in purpose than a partnership. While a joint venture encompasses fewer objectives than a partnership, both exist in a business or commercial setting. Joint enterprise, which may be considered a third stage of development, is an unique creation of American jurisprudence.

*Id.* The theory of joint enterprise is to hold each party the agent of the other and thereby hold each responsible for the negligence of the other.[4] But the court noted that it had not limited the doctrine to those having a commercial or business purpose. *Id.* at 15. Instead, it had considered a broad range

---

[4] We reiterate for clarity that the jury here failed to find that Willison was the agent of either Arthur or Magiera.

of activities by fellow travelers as fulfilling the joint purpose requirement, such as driving to work, going to church and to buy groceries, and even driving to a masquerade dance. *Id.* at 16. It concluded that "the facts now before us fall well within the elements of joint enterprise articulated by this Court, i.e., a joint interest in the object and purpose of the enterprise . . . ." *Id.* The facts here compel the same conclusion.

### Community of Pecuniary Interest

But the *Shoemaker* court did not find that the facts established a community of pecuniary interest. In adopting Section 491, comment c of the Restatement,[5] the court limited the application of the doctrine "to an enterprise having a business or pecuniary purpose . . . ." *Id.* at 17. This avoids the imposition of a commercial concept upon relationships not having that characteristic. *Id.* Because the two owner/pilots had no pecuniary interest in the common purpose of the flight--a voluntary search mission for the Civil Air Patrol--Whistler could not be held vicariously liable. *Id.*

Arthur and Magiera direct us to *St. Joseph Hospital v. Wolff*, 94 S.W.3d 513 (Tex. 2002). There, a minor patient and her parents brought a medical malpractice claim against a surgical resident, the teaching hospital that sponsored the residency program, and the Foundation that actually employed the resident. Among other issues, the jury found that St. Joseph Hospital and the Foundation were engaged in a joint venture. Judgment was rendered in favor of the plaintiffs for $9.5 million. The court of appeals affirmed. *Id.* at 518. The Supreme Court reversed and rendered judgment in favor of the hospital, finding no evidence of a community of pecuniary interest. *Id.* at 534, 544.

The court specified that the ordinary meaning of "pecuniary" is "of or pertaining to money" and this monetary interest must be common among the members of the group. *Id.* Monetary benefits

---

[5] RESTATEMENT [SECOND] OF TORTS § 491 cmt. c(3)(1965).

flowing from the enterprise will not suffice--there must still be evidence that the monetary benefits were shared among the members without special or distinguishing characteristics. *Id.* We find the following language particularly pertinent here:

> The Restatement, however, requires the members of a joint enterprise to have a community of pecuniary interest in the common purpose or goal of the enterprise, not the means by which that purpose or goal is achieved. Like the co-owners who purchased the search plane that crashed in *Shoemaker*, St. Joseph and the Foundation may have both spent money in connection with the residency program. The investment of time and money to fulfill a common purpose, however, does not render that purpose 'pecuniary' in nature. Rather, such an expenditure may be evidence of a common purpose or a joint right of control concerning the project or enterprise undertaken to accomplish that purpose. It does not, however, invest a non-pecuniary purpose with a pecuniary nature. Were it otherwise, an agreement to share the costs of accomplishing a common--though non-pecuniary--purpose, such as taking a shared vacation or jointly purchasing a boat for recreational purposes, would render that purpose pecuniary in nature and, thus, sufficient to meet the third element of the Restatement's joint enterprise definition.

> Additionally, sharing the costs of accomplishing a common purpose does not render the parties' respective interests in that purpose 'community' in nature. There still must be some evidence that the parties shared or held in community a pecuniary interest in the relevant common purpose.

*Id.* at 533. While Magiera and Hernandez hoped to make a profit from Dove Homes, that company had not built a single house at the time of the crash. More importantly, none of the parties intended to make a profit from the *airplane*, which was the common purpose. Arthur and Hernandez shared the expense of the purchase. Willison did not contribute any cash, although he contributed his time. We can't tell from the record how long Magiera and Arthur had been married, but the record does reflect that Arthur had the credit to obtain the financing. In the absence of evidence that the lender looked only to her separate property for repayment, we must presume that the community estate contributed to the purchase. *Sprick v. Sprick,* 25 S.W.3d 7, 13 (Tex.App.--El Paso 1999, pet. denied) ("[D]ebts contracted during the marriage are presumed to be on the credit of the community and thus are community obligations, unless it is shown that the creditor agreed to look solely to the separate

estate of the contracting spouse for satisfaction."). Nevertheless, "[t]he investment of time and money to fulfill a common purpose . . . does not render that purpose 'pecuniary' in nature." *Wolff*, 94 S.W.3d at 533.

In turn, Grimmett relies upon *Texas Department of Transportation v. Able*, 35 S.W.3d 608 (Tex. 2000). There, the Supreme Court found that a community of pecuniary interest existed between TxDOT and the Houston Metropolitan Transit Authority (Metro) as a result of the Transitways Master Operations and Maintenance Agreement by which the high-occupancy vehicle (HOV) lanes were constructed and maintained. The court relied on the language in the contract which recognized "that the Transitways project involved substantial sums of money and contemplated a sharing of resources in order to make better use of this money." *Id.* at 614. The contract also contemplated an economic gain that could be realized by jointly undertaking the activities. *Id.* The court concluded that the project "was not a matter of 'friendly or family cooperation and accommodation' but was instead a transaction by two parties that had a community of pecuniary interest in the purpose." *Id.* Grimmett suggests that this reference to a "sharing of resources" likens her case to *Able*. We must disagree for the same reasons that the Supreme Court distinguished *Able* in *Wolff*:

> The opinion in *Able* recited that the evidence included documents explaining the joint nature of TxDOT's and Metro's financial undertakings with respect to the construction and operation of the high occupancy vehicle lane involved in the case and stated that the documents 'clearly contemplate an economic gain that could be realized by undertaking the activities in [the manner they contracted].' By contrast, this case contains no evidence that either St. Joseph or the Foundation agreed to share with each other any financial benefits resulting from the operation of the general surgery residency program as a whole, the program's operations at Brackenridge, or Wolff's treatment.

*Wolff*, 94 S.W.3d at 533. While the parties here clearly agreed to share the airplane, there is no evidence that they "agreed to share with each other any financial benefits resulting from the

operation" of the airplane." *Id.*  Indirect, potential financial interests do not satisfy the test.  *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 850 (Tex.App.--Fort Worth 2006, no pet.).

### An Equal Right of Control

*Shoemaker* is also instructive on the right of control among members of the joint enterprise.  "A distinction is drawn between the right of control and the actual power or physical capacity to control.  The latter may be lacking without affecting the question." 513 S.W.2d at 14.  Each member of the joint enterprise must have some voice and right to be heard in its control and management.  *Id.* at 14-15.  "The Restatement 2d of Torts (1965) § 491 speaks of this essential element in terms of an equal right to a voice in the direction of the enterprise." *Id.* at 15.  Arthur and Magiera elicited abundant evidence that Willison, as the pilot, was in sole control of the airplane.  They were not on board, and even if they had been, as non-pilots they would not have been able to exercise control.  But this does not answer the question, as the *Shoemaker* court emphasized:

> No more than one person--whether owner or non-owner pilot or driver--can be in superior command of an airplane or driving an automobile at the same time.  But this does not gainsay the authority, and the right to be heard, that is inherent in the joint ownership of the passenger owner.  The practical fact that a passenger or one in subordinate command is not expected to wrest the controls of an airplane from the pilot while flying through the air or, for that matter, to wrest the steering wheel of an automobile while speeding down the highway, is present to the same extent in the circumstances of joint ownership as in the circumstances of a non-owner pilot or driver and the passenger-owner situation.  Yet in this latter situation we have observed in imposing vicarious liability that the owner-passenger had the right to exercise control, and we have imputed the negligence of the driver to the owner.

*Id*. at 15-16.  Nor can this issue be decided simply on the basis that there was a pecking order among the members of the group for use of the airplane.  The court rejected a test requiring that the person to whom negligence is imputed must occupy a position of superiority and an overriding authority over the negligent actor.  "Indeed, not only is this test foreign to our writings but we have not found it to be recognized in any decision to which we have been cited nor considered in the writings of

legal scholars on this subject." *Id.* at 16. We similarly reject the argument here.

## Conclusion

The evidence is both legally and factually sufficient to establish three of the elements necessary for a joint enterprise. It is legally insufficient on the element of community of pecuniary interest. Consequently, we sustain Arthur's Issue One and Magiera's Issue Two. We overrule as moot Arthur's Issue Three and Magiera's Issue Four.

## JOINT VENTURE

Having determined that liability cannot be imposed on the basis of a joint enterprise, we must next address the evidence of joint venture. In Arthur's Issues Two and Four and in Magiera's Issues Three and Five, the couple challenges the legal and factually sufficiency of the evidence to support the jury's findings.

The jury was charged with the following definition of joint venture:

A joint venture exists if the persons concerned have an agreement that has all of the following elements:

(1)    a community of interest in the venture;

(2)    an agreement to share profits;

(3)    an express agreement to share losses; and

(4)    a mutual right of control or management of the venture.

*See Wolff*, 94 S.W.3d at 535. If there is no evidence of any of these elements, the jury's finding cannot be sustained. *Id.*, *citing Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1977).

Inasmuch as the airplane was not intended to generate a profit, nor was it to be used for chartered flights, there is no evidence of an agreement to share monetary profits from the aircraft

itself. Grimmett contends that a profitable Dove Homes would generate a profit for Magiera and Hernandez. As Magiera's wife, Arthur would share in the profits as well. Willison would profit by flying the airplane to and from Lajitas. Even were we to agree with this argument, there is absolutely no evidence of an express agreement to share losses. Grimmett argues that a sharing of losses does not necessarily require the loss of actual money, but can involve the loss of something of value, including services provided. She suggests that the airplane had value, and once it crashed, all of the members of the group shared in the loss. Willison no longer had access to the airplane to use in his business. Having lost the value of the pilot services he provided, Willison also would never obtain an ownership interest in the plane. Arthur had provided the purchase money but would never be able to use the plane. Magiera provided services in obtaining fuel for the plane, but he would never use it either. Hernandez lost his down payment and expense reimbursements.

The charge distinguished between "an agreement" (referring to profits) and "an express agreement" (referring to losses). "Express" means "clearly and unmistakably communicated; directly stated." BLACK'S LAW DICTIONARY 601 (7th ed. 1999). The "losses" that Grimmett identifies are implicit at best. No joint venture exists as a matter of law where an agreement includes a provision for sharing profits, but no express provision for sharing losses. *Gutierrez v. Yancey,* 650 S.W.2d 169, 172 (Tex.App.--San Antonio 1983, no writ).

We sustain Arthur's Issue Two and Magiera's Issue Three. We overrule as moot Arthur's Issue Four and Magiera's Issue Five. Because of our disposition of these issues, it is unnecessary for us to consider the remaining points of error. Consequently, we reverse and render judgment that Grimmett take nothing against Arthur and Magiera.

August 12, 2009

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating