Affirmed, and Opinion filed October 16, 2008








 

Affirmed,
and Opinion filed October 16, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00176-CV

____________

 

GLENN EMILE SEUREAU and GLENN EDOUARD SEUREAU,
Appellants

 

v.

 

EXXONMOBIL
CORPORATION and PORT OF HOUSTON AUTHORITY, Appellees

 

 



 

On Appeal from the
190th District Court

Harris County,
Texas

Trial Court Cause
No. 2002-39943

 



 

O P I N I
O N








This
appeal arises from the unrealized real-estate development plans of appellants
Glenn Emile Seureau and Glenn Edouard Seureau.  Their land abutted property
that was to be developed by the Port of Houston Authority.  In hopes of
prospering from the neighboring development, the Seureaus contracted with
Humble Oil & Refining Company, now ExxonMobil, to be included in the
project.  Several years later, however, ExxonMobil withdrew from the project,
and the Port exercised its eminent-domain powers against appellants= land.  The Seureaus responded by
suing the Port and ExxonMobil for breach of contract and fraudulent
inducement.  The trial court dismissed their claims against the Port because of
governmental immunity, and granted ExxonMobil=s motion for summary judgment on
several grounds, including limitations.  The Seureaus have appealed both
rulings.  We will affirm.

BACKGROUND

Appellants
are Glenn Edouard Seureau (AFather@) and Glenn Emile Seureau, Jr. (ASon@), who owned land in the Galveston
Bay area.  In 1960, Glenn Emile Seureau, Sr. (AGrandfather@) deeded some of the Seureaus= land to Humble Oil & Refining Company,
now ExxonMobil.[1]  ExxonMobil
then transferred that land to the Port of Houston Authority (Athe Port@), which was to use the land to build
and operate a port facility to be known as Bayport.  To finance the Bayport
project, the Port would issue revenue bonds that were to be purchased by
ExxonMobil.








Grandfather
and Father continued to own land adjoining the Bayport project.  It was their
desire to participate in the commercial development of the Bayport area and, as
such, in 1966 they approached ExxonMobil with a written proposal (the ALetter Agreement@) which Grandfather had authored. 
Therein the Seureaus offered to sell additional land to ExxonMobil under the
following conditions.  First, to the extent of ExxonMobil=s interest in the Bayport project,
ExxonMobil would assist the Seureaus in developing their remaining land,
consisting of 175 acres, so as to profit from the burgeoning Bayport project. 
Second,  should ExxonMobil deem any of the land acquired from the Seureaus as Asurplus@ to its needs, it was to offer that
surplus land to the Seureaus for repurchase.  Third, in the event that
ExxonMobil should acquire a specific piece of neighboring property (the AHollier tract@), the parties might swap a
thirteen-acre parcel of the Seureaus= remaining land (the ATriangular tract@) for thirteen acres of the Hollier
tract.

ExxonMobil
agreed to these conditions and executed the Letter Agreement.  It acquired the
lands offered by the Seureaus, including the entirety of Father=s land.  Grandfather continued to
retain 175 acres of remaining land and, upon his death, that land passed to
Son.  During the next few decades, the Port continued to develop the Bayport
project, and ExxonMobil sold chunks of its neighboring land; however, the
portion of its land that abutted the Seureaus=property remained largely
undeveloped, and the Seureaus made no inquiry into the status of the Bayport
project or the further development plans.

In
October 1997, ExxonMobil withdrew from the Bayport project and entered into a
compromise settlement agreement with the Port.  Through that agreement,
ExxonMobil transferred all of its remaining interest in Bayport, including land
previously acquired from the Seureaus, to the Port.  Appellants have contended
that, in doing so, ExxonMobil breached its contractual promise to first offer
such surplus land to the Seureaus.  Moreover, at the time that it exited the
Bayport project, ExxonMobil had not accomplished its promises to assist in the
development of the Seureaus= remaining 175 acres.

In June
1998, Father and Son met with the Port=s real-estate manager and learned
that the Port had acceded to all of ExxonMobil=s interest in the Bayport area,
including the 1966 land acquired from the Seureaus.  Upon learning that
ExxonMobil had ceased its involvement in the Bayport project, the Seureaus met
with the Port=s chairman in July 1998 and insisted that the Port was bound to honor
ExxonMobil=s contractual promises under the Letter Agreement.  While not committing
itself to the Letter Agreement=s obligations, the Port was intrigued by the land swap (i.e.,
Hollier tract for Triangular tract) proposed therein.








However,
wary of the Port=s motives, Son refused to go forward with the trade unless
the Port would agree to waive its eminent-domain powers.  The Port refused to
do so and, in May 2002, instituted proceedings to condemn appellants= property.  The Seureaus responded by
bringing a lawsuit against the Port and ExxonMobil.  They alleged that the Port
and ExxonMobil acted in a joint enterprise to breach the terms of the Letter
Agreement.  During discovery, the Seureaus were provided with a copy of the
1964 written agreements between the Port and ExxonMobil and discovered that
those agreements afforded ExxonMobil no control whatsoever over the development
of the Bayport project.  The Seureaus then amended their suit to claim that
ExxonMobil fraudulently induced them into selling their land under the 1966
Letter Agreement by overstating its degree of control over the Bayport
development.

ExxonMobil
moved for summary judgment in which it argued, inter alia, that
appellants= claims are time-barred by the statute of limitations.  The Port also
asserted a plea to the jurisdiction on the basis of governmental immunity.  The
trial court granted both motions, thereby ending the litigation.  Father and
Son have appealed both rulings.  During the pendency of this appeal, Son
settled his claims against the Port, and we dismissed the portion of his appeal
that relates to the Port.  This prompted the Port to contend that, as to it,
the appeal has become moot because Father lacks legal standing.

                                                                   STANDING

Because
standing is a threshold issue that is implicit in the concept of subject-matter
jurisdiction, we first address Father=s standing.  See Tex. Ass=n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443 (Tex. 1993). 
In addressing standing, we review the plaintiff=s pleadings to determine whether the
petition alleges facts that affirmatively demonstrate our jurisdiction to hear
the case.  See id. at 446.  We must construe the petition in the
plaintiff=s favor and, if necessary, we will review the entire record to determine
if any evidence supports standing.  See id.

 








Much of
the underlying lawsuit relates to the 175 acres of land which belong
exclusively to Son, and in which Father retains no ownership interest. 
However, Father owned some of the land that was sold to ExxonMobil in 1966 and,
in the underlying lawsuit, he seeks rescission of that earlier conveyance. 
Appellants have alleged that the Port now owns some of the land that Father
seeks to re-acquire, and have further contended that the Port, as a participant
in a joint enterprise, is legally responsible for ExxonMobil=s alleged misdeeds.  Because we
construe appellants= petition in their favor, we do not pass on the merits of
their joint-enterprise allegations in this standing discussion.  See id.;
see also Doncer v. Dickerson, 81 S.W.3d 349, 356 (Tex. App.CEl Paso 2002, no pet.) (AIt should always be borne in mind
that standing to sue does not mean a right to win, but merely a right to be
heard in court.@); In re Smith, 260 S.W.3d 568, 573 (Tex. App.CHouston [14th Dist.] 2008, orig.
proceeding).

We
conclude that Father has a justiciable interest in the appeal of the trial
court=s order granting the Port=s plea to the jurisdiction.  See
Austin Nursing Ctr., Inc. v. Lovato, 171 S.W.3d 845, 848 (Tex. 2005). 
Therefore, we hold that Father has standing and that we have subject-matter
jurisdiction to consider his challenge to the Port=s assertion of governmental immunity.

                                                 GOVERNMENTAL
IMMUNITY








Father
contends that the trial court erred in granting the Port=s plea to the jurisdiction and
dismissing the Seureaus= claims, because appellants had established the Legislature=s consent to their lawsuit.  First,
he argues that notwithstanding the contrary conclusion reached by the Texas
Supreme Court in Tooke v. City of Mexia,[2]
the Legislature clearly and unambiguously consented to this suit by employing Asue and be sued@ language in the statute governing
navigation districts.  Second, he urges us to extend the holding in Texas
Department of Transportation v. Able[3]
to recognize joint venture as a separate ground for finding waiver of
governmental immunity in contract actions.  Third, Father argues that the Port=s conduct is so egregious as to fit
the rather limited Awaiver by conduct@ possibility the Texas Supreme Court
theorized in a footnote to Federal Sign v. Texas Southern University.[4] 
We will address each of these contentions in turn, following a discussion of
basic governmental-immunity principles.

A.        Immunity, Generally








A trial
court must have subject-matter jurisdiction before it may hear a case.  See
Tex. Ass=n of Bus., 852 S.W.2d at 443.  A plaintiff bears the initial burden of
alleging facts that affirmatively demonstrate the trial court=s subject-matter jurisdiction over
the suit.  Id. at 446.  A defendant may challenge the court=s subject-matter jurisdiction through
a plea to the jurisdiction.  Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d
547, 554 (Tex. 2000).  Where, as here, the defendant is a governmental entity,
it may file a plea to the jurisdiction asserting governmental immunity.[5] 
See Tex. Natural Res. Conservation Comm=n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002). 
Under the doctrine of governmental immunity, such a political subdivision of
the State may be immune from suit.  See Tex. Dep=t of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999). 
Governmental immunity consists of two components, immunity from liability and
immunity from suit.  Tooke v. City of Mexia, 197 S.W.3d 325, 332 (Tex.
2006).  A governmental entity that enters into a contract may waive immunity
from liability and voluntarily bind itself to the contractual terms, but the
entity does not thereby waive immunity from suit.  Id.  Immunity from
suit, by contrast, bars a suit against the governmental entity unless the
Legislature expressly consents to the suit by resolution or by clear and
unambiguous statutory language.  See id. at 332B33; IT-Davy, 74 S.W.3d at 853B54.  Thus, a plaintiff who sues a
governmental entity must establish the State=s consent to suit.  See IT-Davy,
74 S.W.3d at 855.  Absent such express consent, the governmental entity retains
immunity even if its liability is undisputed.  Id. at 853.

B.        Standard of Review

When a
plea to the jurisdiction challenges the pleadings, the trial court considers
the allegations in the plaintiff=s petition, which is to be construed
in favor of the plaintiff, to determine if the plaintiff alleged facts
affirmatively demonstrating the court=s jurisdiction to  hear the case.  Tex.
Dep=t of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004). 
To the extent relevant to the jurisdiction issue, the trial court may also
consider evidence submitted by the parties.  Bland Indep. Sch. Dist., 34
S.W.3d at 555.  If the trial court concludes that a fact issue exists, the plea
may not be granted.  Miranda, 133 S.W.3d at 227B28.  If the relevant evidence is
undisputed or fails to raise a fact issue as to jurisdiction, the trial court
may rule on the plea as a matter of law.  Id. at 228.  On appeal,
because subject-matter jurisdiction is a question of law, we review the trial
court=s ruling on a plea to the
jurisdiction de novo.  Houston Mun. Employees Pension Sys. v. Ferrell,
248 S.W.3d 151, 156 (Tex. 2007). 

C.        ASue and Be Sued@








The Port
is a navigation district and political subdivision of the State.  City of
Seabrook, 199 S.W.3d at 404.  The Legislature created the Port in 1927
pursuant to article III, section 52, of the Texas Constitution.[6] 
In 1957, the Legislature converted the Port into an article XVI, section 59
district.[7]  While the
converted district was to operate under article XVI, section 59, it retained
all powers conferred upon it through article III, section 52.  See Tex.
Water Code Ann. ' 60.246 (Vernon 2004); Act of Apr. 11, 1957, 55th Leg., R.S.,
ch. 117, ' 2, 1957 Tex. Gen. Laws 241, 247.

An
article-III-section-52 navigation district is governed by chapter 61 of the Texas
Water Code.  See Tex. Water Code Ann. ' 61.021 (Vernon 2004).  Chapter 61
provides that such a navigation district Amay sue and be sued in any court in
this state in the name of the district.@  See id. ' 61.082(a).  Chapter 62, which
applies to article-XVI-section-59 navigation districts, contains a similar
provision stating that a navigation district may Asue and be sued@ in the name of the district.  See
id. '' 62.021, 62.078(a).  Father argues
that these statutes clearly and unambiguously signal a legislative intent to
waive a navigation district=s governmental immunity from suit.  We disagree.

In 1970,
the Texas Supreme Court held that such Asue and be sued@ language granted legislative consent
for lawsuits against navigation districts.  See Mo. Pac. R.R. Co. v.
Brownsville Navigation Dist., 453 S.W.2d 812, 813 (Tex. 1970).  The
majority of appellate courts, including this Court, relied on Missouri
Pacific to conclude that Asue and be sued@ language indicated a Asufficient pronouncement of
legislative intent to waive immunity from suit.@  See, e.g., Tomball Hosp. Auth.
v. Harris County Hosp. Dist., 178 S.W.3d 244, 251B53 (Tex. App.CHouston [14th Dist.] 2005, pet.
granted).  That reliance proved misplaced in 2006, when the Texas Supreme Court
overruled Missouri Pacific:








Accordingly, we conclude that Missouri Pacific must be, and now
is, overruled. . . . [T]he holding of Missouri Pacific that Asue and be sued,@ by
itself, in an organic statute always waives immunity from suit is simply incorrect. 
The phrase is often used to mean only that an entity has the capacity to sue
and be sued in its own name.  Because the phrase means different things in
different statutes, it cannot be said to be clear and unambiguous.  As we have
seen, the words Asue and be sued,@
standing alone, are if anything, unclear and ambiguous.  The effect of similar
clauses, like Aplead and be impleaded,@ is indistinguishable, and therefore those clauses do not, by
themselves, waive immunity.

 

Tooke, 197 S.W.3d at 342 (emphasis
added).  

Although
Tooke rung the death knell for Missouri Pacific, Father
nonetheless urges us to resuscitate it and conclude that the Legislature
consented to the suit.  When this lawsuit was filed in 2002, he argues, Athere was no doubt that@ the Port=s immunity had been waived under the
rationale of Missouri Pacific.  Then, in 2005, the Legislature enacted a
statute providing for a limited waiver of a governmental entity=s immunity for entering into certain
types of contracts.  See Tex. Loc. Gov=t Code Ann. ' 271.152 (Vernon 2005).  The enacting
legislation provided that A[a] claim that arises under a contract executed before the
effective date of this Act and with respect to which sovereign immunity has
been waived is governed by the law in effect on the date the contract was
executed, and the former law is continued in effect for that purpose.@  Act of May 23, 2005, 79th Leg.,
R.S., ch. 604, ' 2, 2005 Tex. Gen. Laws 1548, 1549 (emphasis added).  The
effect of this 2005 legislation, Father argues, was to preserve the Missouri
Pacific waiver of the Port=s immunity notwithstanding the Texas Supreme Court=s subsequent pronouncement in Tooke. 
We must reject this argument for at least three reasons.

First,
it is debatable whether the 2005 legislation even applies to Father=s claims against the Port.  The
legislation=s limited waiver of immunity provides:








A local
governmental entity that is authorized by statute or the constitution to enter
into a contract and that enters into a contract subject to this subchapter
waives sovereign immunity to suit for the purpose of adjudicating a claim for
breach of the contract, subject to the terms and conditions of this subchapter.

 

Tex. Loc. Gov=t Code Ann. ' 271.152 (emphasis added).  A Acontract subject to this subchapter@ is defined as Aa written contract stating the
essential terms of the agreement for providing goods or services to the local
governmental entity that is properly executed on behalf of the local
governmental entity.@  See id. ' 271.151(2).  However, the Port did
not enter into a Acontract subject to this subchapter.@  It is uncontroverted that the Port
was not a nominal party to the Seureaus= Letter Agreement with ExxonMobil
and, thus, it is beyond question that the Letter Agreement was not Aproperly executed on behalf of@ the Port.  See id.  Nor may
the Letter Agreement be construed, even liberally, as Aproviding goods or services@ to the Port.  See id. 
Therefore, because the Port did not enter into a contract subject to the 2005
legislation, the provision that perpetuates former immunity waivers as to
claims governed by subchapter I does not apply here.  See Act of May
23, 2005, 79th Leg., R.S., ch. 604, ' 2, 2005 Tex. Gen. Laws 1548, 1549.








Second,
we cannot accept the premise of Father=s argument that, when the lawsuit was
filed in 2002, Missouri Pacific had already waived the Port=s immunity.[8] 
It is for the Legislature, not the judiciary, to waive a governmental entity=s immunity to suit.  IT-Davy,
74 S.W.3d at 854.  Thus, in Missouri Pacific, the Texas Supreme Court
did not create a separate judicial exception to waiver, but rather
interpreted a Asue and be sued@ statute as a legislative waiver of immunity.  Missouri
Pacific, 453 S.W.2d at 813.  In Tooke, the Texas Supreme Court
recognized that its previous statutory construction in Missouri Pacific Ais simply incorrect,@ and that the Legislature=s use of the words Asue and be sued@ does not clearly and unambiguously
waive immunity.  Tooke, 197 S.W.3d at 342.  Thus, when the Seureaus
filed their lawsuit in 2002, the Legislature had not waived the Port=s immunity by using Asue and be sued@ language in statutes governing
navigation districts.  See id.  Even had Tooke effected a
change in the law, the Texas Supreme Court=s decision applies retroactively.  See
Bowen v. Aetna Cas. & Sur. Co., 837 S.W.2d 99, 100 (Tex. 1992); Newsome
v. Charter Bank Colonial, 940 S.W.2d 157, 162 (Tex. App.CHouston [14th Dist.] 1996, writ
denied); see also Whole Foods Mkt. Sw., L.P. v. Tijerina, 979 S.W.2d
768, 773 (Tex. App.CHouston [14th Dist.] 1998, pet. denied) (requiring courts to
render decisions in light of changes in law).

Third,
even before Tooke was issued in 2006, there was considerable debate
among Texas courts as to whether the words Asue and be sued,@ or similar language, by themselves
waived immunity.  See Tooke, 197 S.W.3d at 338B39 (surveying appellate courts= response to Missouri Pacific);
Tomball Hosp. Auth., 178 S.W.3d at 251B52 (same).  In overruling Missouri
Pacific, the Texas Supreme Court noted the varying treatment of its
authority by Texas appellate courts, and concluded that A[b]ecause the phrase means different
things in different statutes, it cannot be said to be clear and unambiguous.@  Tooke, 197 S.W.3d at 342. 
Thus, we cannot accept Father=s contention that in 2002 there was Ano doubt@ that the Legislature had waived the
Port=s immunity from suit.








Accordingly,
we hold that the Asue and be sued@ language found in chapters 61 and 62
of the Texas Water Code does not clearly and unambiguously waive the Port=s immunity from suit.

D.        Joint Enterprise

Alternatively,
Father contends that the Port=s governmental immunity is waived because, under the theory
of joint enterprise, the Port should be held responsible for ExxonMobil=s alleged wrongdoing.  Generally, the
theory of joint enterprise imputes liability to one who did not do wrong, but
who is so closely connected to an active wrongdoer as to justify the imposition
of vicarious liability.  See Esquivel v. Murray Guard, Inc., 992 S.W.2d
536, 541 (Tex. App.CHouston [14th Dist.] 1999, pet. denied).  Father contends
that the Texas Supreme Court has recognized joint enterprise as an independent
basis for waiver of governmental immunity, citing Texas Department of
Transportation v. Able, 35 S.W.3d 608 (Tex. 2000).  We disagree with this
expansive reading of Able.[9]








Able arose from a personal-injury lawsuit
filed by the surviving relatives and estate of Margaret Able, who was killed
when her automobile was struck head-on by a vehicle driving the wrong direction
in the same HOV lane.  Id. at 610.  The plaintiffs sued the Texas
Department of Transportation (ATxDOT@) and the Houston Metropolitan Transit Authority (AMetro@), among others, for negligence and
gross negligence.  See id.  The jury found MetroCbut not TxDOTCnegligent, and likewise found that
TxDOT had entered into a joint enterprise with Metro.  See id.  TxDOT
appealed, arguing that sovereign immunity had not been waived.  See id.
at 610B11.  However, the Legislature had provided
for limited waiver of sovereign immunity for Apersonal injury and death so caused
by a condition or use of tangible personal or real property if the governmental
unit would, were it a private person, be liable to the claimant according to
Texas law.@  Tex. Civ. Prac. & Rem. Code Ann. ' 101.021(2) (Vernon 2005).  Because
the Legislature had expressly consented to a personal-injury suit against a
governmental entity, the theory of joint enterprise would prevent TxDOT from
escaping liability:

Here the
trial court found a waiver of sovereign immunity because of the jury=s finding that there was a joint enterprise.  Because
the jury found that TxDOT was not individually negligent for a premises defect,
TxDOT can only be liable if the joint enterprise finding brings the
liability within the waiver of sovereign immunity language in the Tort Claims
Act.  Section 101.021(2) waives liability for a governmental unit if Athe governmental unit would, were it a private person,
be liable to the claimant according to Texas law.@  We have stated in the context of private parties that Athe theory of joint enterprise is to make each party
thereto the agent of the other and thereby to hold each responsible for the
negligent act of the other.@  If there is a
joint enterprise here between Metro and TxDOT, and if TxDOT would have been
liable for Metro=s negligence had TxDOT been a private person, then we
must conclude that the State has waived its immunity and that TxDOT is liable
under the plain meaning of section 101.021(2).

 

Able, 35 S.W.3d at 613 (citations
omitted) (emphasis added).  Thus, the Able court utilized joint
enterprise not as an independent basis for waiver but, rather, to Abring the liability within@ the waiver provisions of the Tort
Claims Act.  See id.  This result comports with the well-known principle
that the LegislatureCthrough statute or resolutionCwaives immunity from suit, and not
the courts through the application of common-law theories.  See IT-Davy,
74 S.W.3d at 854.








Unlike
in Able, the Legislature has not waived the Port=s governmental immunity from suit.  Able involved
statutory waiver under the Tort Claims Act, but the Seureaus concede that their
fraud and contract claims fall outside of the Tort Claims Act.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 101.021 (waiving immunity for
property damage, personal injury, and death under certain conditions); City
of Fort Worth v. Patusek Indus., Inc., 48 S.W.3d 366, 372 (Tex. App.CFort Worth 2001, no pet.) (holding
that Legislature did not waive immunity for fraud and contract claims).  Nor
has the Legislature elsewhere waived the Port=s immunity against the Seureaus= claims.  As is discussed above, the
contract claim does not fall within the auspices of the waiver provisions of
the Local Government Code.  See Tex. Loc. Gov=t Code Ann. ' 271.151, et seq.  Although
the Legislature has provided for an administrative remedy for certain
breach-of-contract cases, the statutory provisions would not apply to the
Letter Agreement, which was executed before August 30, 1999.  See IT-Davy,
74 S.W.3d at 856.[10]  Finally,
the Legislature has not waived immunity with respect to the intentional tort of
fraud.[11]  See
Patusek Indus., 48 S.W.3d at 372; Ethio Express Shuttle Serv., Inc. v.
City of Houston, 164 S.W.3d 751, 757B58 (Tex. App.CHouston [14th Dist.] 2005, no pet.); City
of Houston v. Petroleum Traders Corp., 261 S.W.3d 350, 361 (Tex. App.CHouston [14th Dist.] 2008, rule
53.7(f) motion granted).  Accordingly, we hold that, absent legislative consent
to suit, the common-law theory of joint enterprise, by itself, does not waive a
governmental entity=s immunity from suit.  See Able, 35 S.W.3d at 613.

Moreover,
as is discussed below, we hold that the evidence fails to demonstrate a joint
enterprise by the Port and ExxonMobil to acquire the land subject to the 1966
Letter Agreement.

E.        Waiver by Conduct








In 1997,
the Texas Supreme Court held that a governmental entity does not waive immunity
from a breach-of-contract suit simply by entering into a contract for goods and
services.  Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 408 (Tex. 1997). 
In a footnote, Justice Baker=s majority opinion suggested that A[t]here may be other circumstances
where the State may waive its immunity by conduct other than simply executing a
contract so that it is not always immune from suit when it contracts.@  Id. at 408 n.1.  Justice
Hecht concurred, offering that Atoday=s decision does not hold that the State is always immune from
suit for breach of contract absent legislative consent; it holds only that the
mere execution of a contract for goods and services, without more, does not
waive immunity from suit.@  Id. at 413 (Hecht, J., concurring).  Relying on the
footnote, several courts of appeals opted to recognize a judicially imposed,
equitable waiver of immunity from suit.  Gen. Servs. Comm=n v. Little-Tex Insulation Co., 39 S.W.3d 591, 595 (Tex. 2001). 
Those courts concluded that the State waives immunity from a breach-of-contract
suit if it accepts benefits under a contract for goods or services.  See id.

But in
2002, Justice Baker, writing for a plurality of four justices, insisted that no
such Awaiver by conduct@ exception exists:

We again reaffirm that it is the Legislature=s sole province to waive or abrogate sovereign
immunity. . . .  Creating a waiver-by-conduct exception would force the State
to expend its resources to litigate the waiver-by-conduct issue before enjoying
sovereign immunity=s protectionsCand
this would defeat many of the doctrine=s
underlying policies.

. . . .  Because we have consistently held that only the Legislature
can waive sovereign immunity from suit, allowing other governmental entities to
waive immunity by conduct that includes accepting benefits under a contract
would be fundamentally inconsistent with our established jurisprudence. . . . 
Accordingly, we reject IT-Davy=s argument that
we should fashion such a waiver-by-conduct exception in a breach-of-contract
suit against the State.

 








IT-Davy, 74 S.W.3d at 857 (citations
omitted).  Justice Hecht, writing a concurring opinion for a plurality of four
justices, found no waiver because IT-Davy presented Anothing more than an ordinary
contract dispute,@ but refused to foreclose altogether the possibility of a
waiver-by-conduct exception in a subsequent lawsuit.  See id. at 860B61 (Hecht, J., concurring).  In a
dissenting opinion, Justice Enoch admonished his colleagues for continuing to
offer Afalse hope@ to litigants by failing to outline
the parameters that constitute waiver by conduct:

Oddly, Justice Hecht, rather than join Justice Baker, offers hope that
there remains another keyCa magic key that will loosen sovereign immunity=s lock and open the courthouse doors.  But it is false
hope.  He is unable to identify and can give only vague clues about what that
key may look like.  This just encourages endless, fruitless litigation as each
new contracting party, thinking it has discovered the key, seeks to open the
courthouse door. . . . [IT-Davy] will learn from this Court that, alas, it didn=t have the magic key.

 

Id. at 863 (Enoch, J., dissenting).

Although
the Texas Supreme Court has yet to find, much less define, waiver by conduct,
the Court has strongly hinted that equitable concerns would come into play:

In Federal
Sign, we noted that there might be circumstances Awhere the State may waive its immunity by conduct
other than simply executing a contract,@
although under the facts of that case, it was not necessary to indicate what
those circumstances might be.  Since Federal Sign, we have had several
occasions to consider circumstances that were urged to constitute a waiver by conduct. 
We held that the facts these cases presented did not support an equitable
waiver by conduct of the governmental entities= immunity.

 

Catalina Dev., Inc. v.
County of El Paso,
121 S.W.3d 704, 705 (Tex. 2003) (citations omitted) (emphasis added). 
Finding that the governmental entity Adid not profit unfairly@ at the expense of the party with
which it contracted, the Court held that Athe equitable basis for such a waiver
simply does not exist under this set of facts.@  Id. at 706.  Instead of
adopting a categorical approach or bright-line rule, it appears that courts are
to evaluate the waiver-by-conduct exception on the facts and equity of each
case.  See Tex. S. Univ. v. State Street Bank & Trust Co., 212
S.W.3d 893, 907 (Tex. App.CHouston [1st Dist.] 2007, pet. denied).








Last
year, the First Court of Appeals found that under Aextraordinary factual circumstances@ a governmental entity engaged in
conduct so inequitable and egregious as to waive its immunity.  See id.
at 907B08.  Texas Southern University had
contractually agreed to lease physical-plant equipment from CMS Viron Corporation. 
See id. at 897.  Attached as an exhibit to the Master Lease between TSU
and Viron was an opinion letter authored by TSU=s general counsel, upon which Viron
was entitled to rely.  See id. at 898.  The opinion letter assured Viron
that the Master Lease was legal, valid, binding, and enforceable, and that, in
the event of a judgment for money damages, TSU would be Aobligated to pay@ any judgment.  See id.  After
Viron installed the equipment, however, TSU announced that the Master Lease was
void and unenforceable.  See id. at 898, 899.  After Viron filed suit,
TSU then attempted to invoke sovereign immunity.  See id. at 897.  The
appellate court found waiver by conduct:

[Viron]
argues . . . that Athe injustice is even worse, because this case also
includes an additional fact that appears in none of the prior [immunity]
cases:  The government officials lured Viron into the Master Lease with false
promises that the contract would be valid and enforceable, then disclaimed any
obligation on the contract by taking the position that the contract was not
valid after all.@

We agree.  Based on the facts before us, we . . . hold that sovereign
immunity does not defeat the trial court=s
subject-matter jurisdiction over Viron=s
claims for breach of contract.

 

Id. at 908.  








In this
case, Father attempts to analogize the Port=s conduct to TSU=s in State Street, and asserts
that he, too, carries the Amagic key@ to unlock the courthouse doors.  See IT-Davy, 74
S.W.3d at 863 (Enoch, J., dissenting).  He does not.  We will discuss his
specific allegations below; generally, he asserts that the Port (1) engaged in
a joint enterprise with ExxonMobil to acquire the Seureaus= lands; (2) enjoyed benefits from the
1966 Letter Agreement used to acquire those lands; (3) refused to honor the
obligations owed by its joint-enterprise agent under the Letter Agreement; and
(4) tried to exercise its eminent-domain powers inequitably.

1.         Joint Enterprise
Allegations:

Appellants
have alleged that:

$          Although the Port was not a party to the
1966 Letter Agreement, the Port was engaged in a joint enterprise with
ExxonMobil, which was a party to the Letter Agreement; and

$          Pursuant to the 1964 Basic Agreement,
ExxonMobil would acquire the lands necessary to construct the Project, and
convey those lands to the Port.

 

We must reject these
allegations  because the evidence submitted by the parties reflects no joint
enterprise to acquire the land covered by the 1966 Letter Agreement but,
rather, to develop the Bayport project on land ExxonMobil had already acquired
in 1960.  The essential elements of a joint enterprise, which interrelate,
require (1) an agreement, express or implied, among the group members; (2) a
common purpose to be carried out by the group; (3) a Acommunity of pecuniary interest@ in that common purpose, among the
members; and (4) an equal right to a voice in the direction of the enterprise,
giving rise to an equal right of control over the enterprise or project formed
to carry out that purpose.  See St. Joseph Hosp. v. Wolff, 94 S.W.3d
513, 526B28 (Tex. 2002); Shoemaker v.
Estate of Whistler, 513 S.W.2d 10, 16B17 (Tex. 1974).  Thus, the
joint-enterprise elements must exist with respect to the same purpose
and enterprise.  St. Joseph Hosp., 94 S.W.3d at 529.  

This
principle takes on added significance in a case in which the members of the
claimed joint enterprise have a more complicated, ongoing relationship.  See
id.  In such a case, the evidence may demonstrate numerous agreements
arising from an assortment of common purposes, thus leading to Aa number of possible projects or >enterprises= devoted to carrying them out.@  Id.








Turning
to the evidence, we conclude that ExxonMobil and the Port had an agreement and
a common purpose to develop the Project on 720 acres that ExxonMobil conveyed
to the Port in 1964, and which included the 259-acre tract which Grandfather
sold to ExxonMobil in 1960.[12]  However,
the 1964 Basic Agreement did not contemplate that the Project would extend
beyond the original 720 acres and certainly did not call for ExxonMobil to
acquire the lands subject to the 1966 Letter Agreement.  The only suggestion of
development outside the 720 acres was a clause under which ExxonMobil, at its
own cost and outside of the 720 acres, could supply pipelines, storage tanks,
and facilities for the transportation and storage of bulk commodities.  This
clause does not contemplate the Port=s involvement in any such endeavor
and, in fact, recites that ExxonMobil would bear all costs associated with
development outside of the 720 acres.  The Letter Agreement supports the notion
that ExxonMobil was not acting in furtherance of the claimed joint enterprise
in acquiring the 1966 lands: A[ExxonMobil] is interested in the development of its Bayport
properties.  It has been disclosed to us that there is opportunity for the location
of an iron ore processing plant in the area and that this may call for
the deepening of the existing Bayport channel.@[13]








Nor does
the evidence reveal any community of pecuniary interest in ExxonMobil=s acquisition of the 1966 lands.  A Acommunity of pecuniary interest@ requires that the members of the
group share, Awithout special or distinguishing characteristics,@ a monetary interest in the
enterprise=s common purpose.  See id. at 531 (citation omitted).  That both
the Port and ExxonMobil may have stood to derive a monetary benefit from the
Bayport project does not satisfy this element.  See id. at 532.  Rather,
there must be evidence that such monetary benefits were to be shared between
the Port and ExxonMobil, without special or distinguishing characteristics.  See
id.  There is no evidence of such an arrangement here with respect to the
group=s common purpose, that is,
development of the Bayport project on the original 720 acres.  

We
conclude that there was no agreement, common purpose, community of pecuniary
interest, or equal right to control, with respect to the possible acquisition
or development of additional lands beyond the original 720 acres, including the
lands addressed by the 1966 Letter Agreement.  Accordingly, we decline to apply
the doctrine of joint enterprise.  See id. at 528.

2.         Accepting Benefits from
the Letter Agreement:

Father
uses his joint-enterprise argument as a springboard to contend further that the
Port waived its immunity by engaging in the following inequitable conduct:

$          The Port benefited from ExxonMobil=s fraud by taking title to the Seureaus= lands while knowing of ExxonMobil=s obligations under the Letter Agreement; and

$          The Port benefited from the Seureaus= obedience to its Letter Agreement with ExxonMobil,
because the Seureaus did not develop their remaining lands and, accordingly,
the Port was able to pay a lower condemnation price for the remaining lands
when it exercised its eminent-domain powers.

 

We have already
determined that no joint-enterprise relationship existed between the Port and
ExxonMobil with respect to the 1966 Letter Agreement and the rights and
obligations contained therein.  Even assuming, arguendo, that the Port
enjoyed benefits from the Letter Agreement, the Texas Supreme Court has
consistently held that a governmental entity does not waive immunity from suit
by accepting the benefits of a contract.  See Tex. A&M Univ. Sys. v.
Koseoglu, 233 S.W.3d 835, 840 (Tex. 2007); Little-Tex, 39 S.W.3d at
598; Catalina Dev. Co., 121 S.W.3d at 705B06; Travis County v. Petzel &
Assocs., Inc., 77 S.W.3d 246, 248 (Tex. 2002); IT-Davy, 74 S.W.3d at
860.  We decline the invitation to depart from these authorities and therefore
re-affirm that, even if the Port derived benefits from a contract to which it
was not a party, the Port did not thereby waive its immunity from suit.








3.         Refusal to Perform
ExxonMobil=s Obligations:

Father
contends that in 1971, the Port Asecretly acknowledg[ed] the Seureaus= contractual development rights@ in the remaining properties.  Again
relying on the incorrect legal assumption that the Port is bound by the Letter
Agreement through joint enterprise, Father  asserts that the Port=s refusal to honor ExxonMobil=s contractual obligations should
result in an equitable waiver of its immunity from suit.  Specifically, he has
alleged that:

$          The Port refused to trade the Hollier tract
for the Triangular tract in 1998; and

$          The Port, by condemning the remaining lands
in 2002, prevented the Seureaus from realizing the economic profit from
development that was contemplated in the Letter Agreement.

 

The record does not
evince the Port=s agreement, express or implied, to honor any of ExxonMobil=s obligations imposed by the Letter
Agreement.  The 1971 Aacknowledgment@ to which Seureau refers consists of
a written proposal, prepared by ExxonMobil, under which the Port would
honor ExxonMobil=s Acertain obligations to Glenn E. Seureau, et al, ... with
respect to development of land in the area.@  However, the Port responded to the
proposal by expressly declining to assume ExxonMobil=s obligations to Seureau, and the
eventual pact struck between the Port and ExxonMobil omits any such assumption
of obligations.  In July 1998, then, when pressed by the Seureaus, the Port did
not agree to be bound by the Letter Agreement.








Even
were the Port obligated by ExxonMobil=s contractual obligations, a
governmental entity=s immunity from suit is not waived merely because the
entity breaches a contract.  AWhen the State contracts, it is liable on contracts made for
its benefit as if it were a private person.  Consequently, when the State
contracts with private citizens it waives immunity from liability.  But the
State does not waive immunity from suit simply by contracting with a private
person.@ Little-Tex, 39 S.W.3d at 594
(citations omitted); Slade v. Tex. S. Univ. Bd. of Regents, 232 S.W.3d
395, 400 (Tex. App.CHouston [1st Dist.] 2007, no pet.) (upholding immunity from
suit despite plaintiff=s pleading of facts potentially demonstrating breach of
contract by governmental entity).  

One of
the reasons that courts defer to the Legislature to waive immunity from suit is
so that the Legislature may revise existing agreements if doing so would
benefit the public.  IT-Davy, 74 S.W.3d at 854.  Thus, legislative
control ensures that current policymakers are neither bound by, nor held
accountable for, their predecessors= rationale for entering into
long-term contracts.  See id.  For this reason, finding waiver by
conduct merely because the plaintiff alleges that the governmental entity
breached the contract would render immunity useless by permitting the exception
to swallow the rule.

4.         Inequitable Use of Eminent
Domain:

As of
July 1998, the Port was aware of the existence of the Letter Agreement.  While
the Port did not agree to be bound by the Letter Agreement, the Port was
intrigued by a portion of it that contemplated a swap of the Hollier tractCwhich had since come into the Port=s possessionCfor the Seureaus= Triangular tract:

If the A.M.
Hollier tract is acquired by [ExxonMobil] as a part of the additional land and
a portion thereof is made available to us under the foregoing provisions
hereof, Glenn E. Seureau agrees, subject to the following condition, to convey
to [ExxonMobil], at its request, the tract in the form of a triangle containing
approximately 13 acres, more or less . . . .  This obligation to convey shall
be conditioned upon there being a specific commitment by [ExxonMobil] or some
governmental authority to construct an all-weather road on the triangular tract
and along the eastern boundary thereof which will provide road frontage to the
land retained by us.  This exchange of the triangular tract shall be on an acre
per acre basis[.]

 








Father alleges that the
Port proposed the land swap with the intent to then exercise its eminent-domain
powers to re-take the traded-away Hollier tract, thereby acquiring both
properties.  However, the proposed deal did not come to pass because the
Seureaus, who remained wary of the Port=s motives, refused to consummate the
trade unless the Port would waive eminent domain.  The Port=s refusal to do so, Father continues,
demonstrates inequitable conduct justifying waiver of the Port=s immunity from suit.  We disagree.

A
governmental entity may not agree to a contract provision that would limit the
free exercise of its governmental powers.  See City of Corpus Christi v.
Taylor, 126 S.W.3d 712, 719 (Tex. App.CCorpus Christi 2004, pet. withdrawn);
Clear Lake City Water Auth. v. Clear Lake Utils. Co., 549 S.W.2d 385,
391 (Tex. 1977).  The power of eminent domain or condemnation is such a
governmental function that cannot be delegated or restricted by contract.  See
City of Corpus Christi, 126 S.W.3d at 719.  Thus, a contract that restricts
a governmental entity=s freedom to decide whether to initiate eminent domain or
condemnation proceedings would be illegal and void.  Id.  The Port=s refusal to waive its eminent-domain
powers, then, was appropriate and not inequitable.  See id.  Thus, we
cannot conclude that the Port waived its immunity from suit by simply offering
to trade the Hollier tract for the Triangular tract, without waiving its
eminent-domain powers.








Moreover,
the SeureausCwho rejected the proposalChave not demonstrated that by  merely offering to swap land
tracts, the Port profited unfairly at their expense.  See Catalina Dev.,
Inc., 121 S.W.3d at 706; see also IT-Davy, 74 S.W.3d at 861 (Hecht,
J., concurring) (AMy hypothetical [in Federal Sign] supposed a
governmental entity that chiseled a contractor just because it could get away
with doing so.@).  In a general sense, waiver involves an Aintentional relinquishment of a known
right or intentional conduct inconsistent with claiming that right.@  Jernigan v. Langley, 111
S.W.3d 153, 156 (Tex. 2003) (citations omitted).  Thus, one can envision waiver
by conduct where, for example, the governmental entity lures one into a
contract by promising that the contract would be enforceable, legal, valid, and
binding, and that the governmental entity would be obligated to pay damages for
breaching same.  See, e.g., State Street, 212 S.W.3d at 898, 908.  Such
an example evinces an implied promise that the governmental entity has
intentionally relinquished its right to claim immunity.  See generally id. 
This case does not involve the type of Aextraordinary circumstances@ present in State Street. 
Waiver by conduct is not warranted in ordinary contract disputes.  See Slade,
232 S.W.3d at 400; IT-Davy, 74 S.W.3d at 861 (Hecht, J., concurring). 
Thus, we are disinclined to extend waiver by conduct to a case that does not
even involve a contract with a governmental entity.

Accordingly,
we affirm the trial court=s order granting the Port=s plea to the jurisdiction and
dismissing, for lack of subject-matter jurisdiction, the Seureaus= claims against the Port.

                                                   STATUTE
OF LIMITATIONS

The
Seureaus contend further that the trial court erred in granting ExxonMobil=s motion for summary judgment. 
Where, as here, the trial court does not specify the basis for its grant of
summary judgment, the appealing party must demonstrate that the trial court erred
in basing it on any ground asserted in the motion.  Chappell Hill Bank v.
Smith, 257 S.W.3d 320, 324 (Tex. App.CHouston [14th Dist.] 2008, no pet.). 
Therefore, we will affirm the summary-judgment order if any of the grounds
advanced in the motion has merit.  See Dow Chem. Co. v. Francis, 46
S.W.3d 237, 242 (Tex. 2001); Dardas v. Fleming, Hovenkamp & Grayson,
P.C., 194 S.W.3d 603, 610 (Tex. App.CHouston [14th Dist.] 2006, pet. denied). 
A defendant moving for summary judgment must conclusively negate at least one
essential element of each of the plaintiff=s causes of action, or conclusively
establish each element of an affirmative defense.  Shirvanian v. DeFrates,
161 S.W.3d 102, 106 (Tex. App.CHouston [14th Dist.] 2004, pet. denied).  We review a grant
of summary judgment de novo, using the same summary-judgment standard employed
by the trial court.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656,
661 (Tex. 2005); Duerr v. Brown, ___ S.W.3d ___, No. 14-07-00619-CV,
2008 WL 2606713, at *3 (Tex. App.CHouston [14th Dist.] July 3, 2008, no
pet.).  That is, we take as true all evidence favorable to the non-movant.  Chappell
Hill Bank, 257 S.W.3d at 324.  We must also indulge every reasonable
inference, and resolve all doubts, in the non-movant=s favor.  Id.








In its
motion for summary judgment, ExxonMobil argued that the Seureaus= claims for fraud and breach of
contract are time-barred by the applicable four-year statute of limitations,
having accrued no later than July 1998.  In response, the SeureausCwho filed suit in August 2002Cinstead urge a May 2002 accrual date,
and have invoked the discovery rule and the doctrine of fraudulent
concealment.  Because we hold that ExxonMobil conclusively established its
affirmative defense of limitations, we affirm the trial court=s summary-judgment order.

A.        Accrual

A
defendant who seeks summary judgment on the basis of limitations must
conclusively prove when the plaintiff=s cause of action accrued.  See
KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748
(Tex. 1999).  AAccrual@ refers to the date when a limitations period begins to run.  See XCO
Prod. Co. v. Jamison, 194 S.W.3d 622, 634 (Tex. App.CHouston [14th Dist.] 2006, pet.
denied).  The date that an action accrues is a question of law.  See Moreno
v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990).








Because
no statute defines the accrual date for the Seureaus= breach-of-contract and fraud claims,
we look to the legal-injury rule to determine the accrual date.  See KPMG,
988 S.W.2d at 750; S.V. v. R.V., 933 S.W.2d 1, 4 (Tex. 1996).  Under the
legal-injury rule, a cause of action generally accrues when a wrongful act
causes some legal injury, regardless of when the plaintiff learns of the
injury, and even if all resulting damages have not yet occurred.  S.V.,
933 S.W.2d at 4.  A legal injury consists of any invasion to the claimant=s legally protected interest.  Goggin
v. Grimes, 969 S.W.2d 135, 137 (Tex. App.CHouston [14th Dist.] 1998, no pet.). 
Stated differently, a cause of action generally accrues when facts come into
existence which authorize a claimant to seek a judicial remedy.  Trail
Enters., Inc. v. City of Houston, 957 S.W.2d 625, 631 (Tex. App.CHouston [14th Dist.] 1997, pet.
denied).  When the defendant=s conduct produces a legal injury, however slight, the cause
of action accrues and the statute of limitations begins to run.  See Childs
v. Haussecker, 974 S.W.2d 31, 41 n.7 (Tex. 1998); Goggin, 969 S.W.2d
at 137.

1.         Fraud

Texas
law prescribes a four-year statute of limitations for fraud actions, including
claims for fraudulent concealment.  See Tex. Civ. Prac. & Rem.
Code Ann. ' 16.004(a) (Vernon 2002); Williams v. Khalaf, 802 S.W.2d 651, 658
(Tex. 1990); Teco-Westinghouse Motor Co. v. Gonzalez, 54 S.W.3d 910, 912
n.2 (Tex. App.CCorpus Christi 2001, no pet.).  A cause of action for fraud accrues on
the date that the defendant makes the allegedly false representations.  Woods
v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988); Hoover v.
Gregory, 835 S.W.2d 668, 676 (Tex. App.CDallas 1992, writ denied).

Appellants= fraud claims arise from promises
that ExxonMobil is alleged to have made when the Letter Agreement was executed
on April 12, 1966.  Thus, the Seureaus= cause of action for fraudulent
inducement accrued no later than April 12, 1966, the date that the allegedly
false representations were made.  Unless saved by the discovery rule or the
doctrine of fraudulent concealment, appellants= fraud claims are time-barred as they
were not first asserted until August 2002, well more than four years after they
accrued.

2.         Breach of Contract








Similarly,
the statute of limitations for breach-of-contract actions is four years from
the date of accrual.  See Tex. Civ. Prac. & Rem. Code Ann. ' 16.051 (Vernon 2008); Stine v.
Stewart, 80 S.W.3d 586, 592 (Tex. 2002).  It is well-settled that an action
for breach of contract accrues immediately upon breach.  Barker v. Eckman,
213 S.W.3d 306, 311 (Tex. 2006); Stine, 80 S.W.3d at 592.  A breach of
contract occurs when a party fails or refuses to do something he has promised
to do.  Mays v. Pierce, 203 S.W.3d 564, 575 (Tex. App.CHouston [14th Dist.] 2006, pet.
denied); Townewest Homeowners Ass=n, Inc. v. Warner Commc=n Inc., 826 S.W.2d 638, 640 (Tex. App.CHouston [14th Dist.] 1992, no writ).

Appellants= contract allegations may be lumped
together in two general categories: the development claims and the
land-transfer claims.  The development claims encompass ExxonMobil=s promise to assist in the
development of the Seureaus= remaining lands and in obtaining rights-of-way, connections,
and private access to any second channel that might be brought into the Bayport
area.  The Seureaus allege that the development claims were breached
immediately upon execution of the 1966 Letter Agreement, because ExxonMobil had
no right to control development of the Bayport project under the 1964 Basic
Agreement, which afforded all such control to the Port alone.

The
land-transfer claims arise from (1) the clause proposing the
Hollier-for-Triangular-tract swap, and (2) ExxonMobil=s contractual promise to offer any Asurplus@ land to the Seureaus for
re-purchase.  These contract provisions must have been breached, if at all, no
later than October 27, 1997, when ExxonMobil transferred all of its remaining
interest in the Bayport project, including the land acquired from the Seureaus
in 1966, to the Port.

According
to the appellants= own pleadings, then, some of their contract claims (i.e.,
the development claims) accrued  on April 12, 1966, with the remainder of their
claims (i.e., the land-transfer claims) accruing no later than October
27, 1997.  See Stine, 80 S.W.3d at 592.  Unless the discovery rule or
doctrine of fraudulent concealment applies, their cause of action for breach of
contract is time-barred, having been filed more than four years after the date
their claims accrued.  See Tex. Civ. Prac. & Rem. Code Ann. ' 16.051.

B.        Discovery Rule and
Fraudulent Concealment








In rare
cases where the nature of the injury is inherently undiscoverable and evidence
of the injury is objectively verifiable, courts have recognized the discovery
rule as an exception to the general accrual rule.  See, e.g., Computer
Assocs. Int=l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996). 
The discovery rule is a very limited exception to limitations and is construed
strictly.  See id.; S.V., 933 S.W.2d at 25 (noting that
applications of discovery rule Ashould be few and narrowly drawn@).  The rule has been limited to
matters that are properly characterized as inherently undiscoverable.  Johnson
v. Abbey, 737 S.W.2d 68, 69B70 (Tex. App.CHouston [14th Dist.] 1987, no writ).  An injury is inherently
undiscoverable if, by its very nature, it is unlikely to be discovered within
the prescribed limitations period despite the exercise of due diligence. 
Wagner & Brown, Ltd. v. Horwood, 58 S.W.3d 732, 734B35 (Tex. 2001).  Whether an injury is
inherently undiscoverable is determined on a categorical basis, because such an
approach Abrings predictability and consistency to the jurisprudence.@  See Apex Towing Co. v. Tolin,
41 S.W.3d 118, 122 (Tex. 2001).  Thus, the focus is on whether a type of
injury, rather than a particular injury, was discoverable.  Via Net
v. TIG Ins. Co., 211 S.W.3d 310, 314 (Tex. 2006).

Where
the discovery rule applies, the cause of action accrues when the plaintiff
knows, or through the exercise of reasonable care and diligence should have
discovered, the nature of his injury and the likelihood that it was caused by
the wrongful acts of another.  See Childs, 974 S.W.2d at 40.  Thus,
accrual is not delayed until the plaintiff learns of actual causes and possible
cures for his injuries.  PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd.
P=ship, 146 S.W.3d 79, 93 (Tex. 2004). 
Instead, a plaintiff who invokes the discovery rule still must have sought
information about his injuries and their likely cause once apprised of facts
that would prompt a reasonably diligent person to make an inquiry that would
lead to discovery of the cause of action.  Pirtle v. Kahn, 177 S.W.3d
567, 571 (Tex. App.CHouston [1st Dist.] 2005, pet. denied).








If, as
here, the plaintiff pleads the discovery rule as an exception to limitations,
the defendant moving for summary judgment must negate it.  KPMG, 988
S.W.2d at 748.  This may be done by demonstrating that the discovery rule does
not apply or by proving, as a matter of law, that there is no genuine issue of
material fact as to when the plaintiff discovered, or in the exercise of
reasonable diligence should have discovered, the nature of his injury.  Childs,
974 S.W.2d at 44.

Although
similar in effect to the discovery rule, the fraudulent-concealment doctrine is
an affirmative defense to limitations that resembles equitable estoppel.  Trousdale
v. Henry, 261 S.W.3d 221, 235 (Tex. App.CHouston [14th Dist.] 2008, rule
53.7(f) motion granted);  Autry v. Dearman, 933 S.W.2d 182, 192 (Tex.
App.CHouston [14th Dist.] 1996, writ
denied).  This doctrine estops a defendant from relying on the defense of
limitations if the defendant was under a duty to make a disclosure but
fraudulently concealed the existence of a cause of action from the party to
whom it belongs.  Ponder v. Brice & Mankoff, 889 S.W.2d 637, 645
(Tex. App.CHouston [14th Dist.] 1994, writ denied).  To prove fraudulent
concealment, the plaintiff must demonstrate that the defendant had (1) actual
knowledge that a wrong occurred, (2) a duty to disclose the wrong, and (3) a
fixed purpose to conceal the wrong.  McMahan v. Greenwood, 108 S.W.3d
467, 493 (Tex. App.CHouston [14th Dist.] 2003, pet. denied).  The estoppel effect
of fraudulent concealment ends when a party learns of facts, conditions, or
circumstances that would cause a reasonably prudent person to make inquiry
which, if pursued, would lead to the discovery of the concealed cause of
action.  Ponder, 889 S.W.2d at 645.  This is the same standard that
applies to the discovery rule.  Trousdale, 261 S.W.3d at 235.

C.        Application to Facts

1.         Fraud and
Contract-Development Claims








Appellants= fraud claims are premised upon their
contention that ExxonMobil, either directly or through a land map presented to
the Seureaus, fraudulently overstated the extent of its ability to control the
development of the Bayport project.[14]  Appellants
agree that ExxonMobil=s actual ability to influence Bayport development, or lack
thereof, is demonstrated by the 1964 Basic Agreement.  Father testified that he
had Aassumed that there were [written]
agreements in cooperation between the Port and [ExxonMobil],@ and he agreed that he could have
requested information about such written agreements Aif it occurred to him.@  Had the Seureaus reviewed the 1964
Basic Agreement, Father testified that they would not have proceeded with the
1966 land sale because, in the Basic Agreement, ExxonMobil Aapportioned away control away from
themselves and even conveyed away the lands that we were depending upon them to
use their leverage in ownership that we provided them earlier to the Port
already, so they had no bargaining position, no leverage to be of help to us.@

Generally,
contracting parties are not fiduciaries.  Via Net, 211 S.W.3d at 314. 
Accordingly, due diligence requires that each contracting party protect its
own interests.  Id.  The exercise of due diligence may require that a
party ask its contract partner for information needed to verify the other=s contractual performance.  See id.;
Wagner & Brown, 58 S.W.3d at 735B36; HECI Exploration Co. v. Neel,
982 S.W.2d 881, 887 (Tex. 1998).  One who, as here, fails to ask for such
information has not used due diligence.  See Via Net, 211 S.W.3d at 314;
HECI, 982 S.W.2d at 887B88.  It is for this reason that the Texas Supreme Court has
expressed concern about the use of the discovery rule in contract actions:








We do not hold today that the discovery rule can never apply to breach
of contract claims.  Our attempts to bring predictability and consistency to
discovery rule jurisprudence have focused on types of injury, not causes of
action.  Some contract breaches may be inherently undiscoverable and
objectively verifiable.  But those cases should be rare, as diligent
contracting parties should generally discover any breach during the relatively
long four-year limitations period provided for such claims.

 

Via Net, 211 S.W.3d at 314B15 (citations omitted).  Review of a
document that Father assumed was in existence, and which he agrees he could
have requested, would have enabled the Seureaus to discover their fraud claims
and contract development claims.  We therefore hold that these claims, and the
Seureaus= legal injury, were not inherently
undiscoverable through the exercise of diligence.  See Via Net, 211
S.W.3d at 314.  Therefore, the discovery rule does not apply to these fraud and
contract-development claims.

Nor may
appellants escape limitations through the doctrine of fraudulent concealment. 
That doctrine ceases to operate upon a party=s discovery of facts, conditions, or
circumstances that would cause a reasonably prudent person to inquire and
discover the concealed cause of action.  See Ponder, 889 S.W.2d at 645. 
The summary-judgment evidence reveals that the Seureaus were aware of such
facts more than four years before they filed their lawsuit.








As of
the early 1960s, the Seureaus knew of the Port=s involvement in the Bayport
project.  Grandfather had marketed the Seureaus= land for sale in a brochure that
commented on the planned development.  The brochure explained that the Port would
be constructing the Anew ship channel and turning basin,@ with the project to be financed by
ExxonMobil.  Then, beginning in 1967, the Seureaus clipped and retained a
series of newspaper articles concerning the Bayport project.  These articles
consistently noted that the Port was in the process of constructing, and
would then operate, both the Bayport channel and the neighboring harbor and
port facilities.  In addition, we note that the Letter Agreement authored by
Grandfather, in which ExxonMobil was to assist the Seureaus in the development
of their remaining land, repeatedly limits such obligations only Ato the extent [ExxonMobil] can reasonably
do so consistently with its interests in Bayport.@  This oft-repeated conditional
language expressly contemplates that ExxonMobil would have something less than
complete control over the development of the Bayport project.

Thus, no
later than January 1967, the Seureaus were on notice that their contract
partner, ExxonMobil, did not have complete control over the Bayport
development, and that the Port did have some degree of control over its
construction and operation.  The Seureaus had not contracted with the Port,
however, and were reluctant to do so given the Port=s eminent-domain powers.  Given that
their development rights hinged upon ExxonMobil=s ability to influence the
development, and the Seureaus= knowledge that such ability was limited to some extent, it
was incumbent upon them to make reasonable inquiry into the nature of the
relationship between ExxonMobil and the Port.  

We
therefore hold that the estoppel effect of fraudulent concealment, if any,
ended many years before the Seureaus opted to bring suit.  See Ponder,
889 S.W.2d at 645.  Thus, the doctrine of fraudulent concealment does not
relieve the Seureaus of the time-barring effects of limitations on their fraud
and contract-development claims.

2.         Land-Transfer Claims








The
Seureaus have alleged that by transferring the land acquired from them to the
Port, ExxonMobil breached its contractual promise to first offer such Asurplus@ land to them.  In addition, they
have noted that ExxonMobil failed to comply with the provision that
contemplated trade of the Hollier tract for an equivalently-sized portion of
the Triangular tract.  We have described these two contract claims as the Aland-transfer claims,@ both of which accrued no later than
October 27, 1997.[15]  To avoid
the bar of limitations, then, the SeureausCwhose suit was filed in August 2002,
more than four years laterCmust try to invoke the discovery rule or the doctrine of
fraudulent concealment.  We hold that neither doctrine operates to render their
lawsuit timely.

In June
1998, appellants met with Brenda McDonald, the Port=s real-estate manager.  They were
given a map showing that the Port, and not ExxonMobil, was planning to develop
the Asurplus@ land that ExxonMobil was allegedly
obligated to offer to them.  Therefore, they were on notice that ExxonMobil had
transferred its interest in the surplus land to the Port, allegedly in
violation of its contractual obligation to first offer that land to them. 
Having learned that the Port had acquired the surplus land, appellants met with
the Port=s chairman, Ned Holmes, hoping to
convince the Port to honor ExxonMobil=s contractual promises.  Certainly by
the conclusion of that meeting, if not before, appellants knew that ExxonMobil
had not, and would not, honor whatever obligations it might have owed under the
Letter Agreement.  About that meeting, Son testified as follows:

I didn=t ask [Holmes] the nature of the relationship [between
the Port and ExxonMobil].  I B it was obvious
to me that there was a very close relationship and that they were cooperating together
and that the Port had come forward in the relationship and that it was now
in the position that Exxon Mobil or Humble had been in previously.

 

Having discovered in June
and July 1998 that ExxonMobil was not in a position to honor its land-transfer
obligations to the Seureaus, any tolling or estoppel effect occasioned by the
discovery rule or by fraudulent concealment would have ended then.  See Bell
v. Showa Denko K.K., 899 S.W.2d 749, 754 (Tex. App.CAmarillo 1995, writ denied)
(discovery rule); Ponder, 889 S.W.2d at 645 (fraudulent concealment). 
Their lawsuit was filed more than four years after July 1998, and appellants= contract land-transfer claims are
time-barred.








Appellants
argue for a May 2002 accrual date, at which time the Port instituted
condemnation proceedings against their land.  Until that time, the argument
goes, appellants were unaware that the Letter Agreement would not be honored. 
This argument misses the point.  No later than July 1998, appellants discovered
that their contract partner, ExxonMobil, had withdrawn from the project and would
not be assisting the Seureaus in developing their remaining land.  To the
extent that ExxonMobil was obligated by the Letter Agreement, its alleged
failure to honor its obligations constituted an actionable breach of contract. 
See Mays, 203 S.W.3d at 575.  Nothing that occurred after that point
affected appellants= causes of action against ExxonMobil but, instead, relate to
their dealings with a separate entity, the Port.  That the Seureaus thereafter
tried to convince the Port to undertake ExxonMobil=s contract obligations does not
excuse their failure to timely bring suit against ExxonMobil.

Accordingly,
we affirm the trial court=s summary judgment in favor of ExxonMobil.  Having determined
that the statute of limitations bars appellants= claims, we need not address the
other grounds stated in ExxonMobil=s motion for summary judgment.  See
Dow Chem. Co., 46 S.W.3d at 242.

                                                                CONCLUSION

We
conclude that appellant Glenn Edourd Seureau has standing to maintain this
appeal against the Port of Houston Authority.  We hold, however, that his
claims against the Port of Houston Authority are barred by governmental
immunity.  We further hold that the Seureaus failed to timely assert their
claims against ExxonMobil, and that those claims therefore are barred by the
statute of limitations.

Accordingly, we affirm the trial court=s orders granting ExxonMobil=s motion for summary judgment and the
Port=s plea to the jurisdiction.

/s/      Jeff Brown

Justice

 

 

Judgment Rendered and Opinion filed
October 16, 2008.

Panel consists of Justices Yates,
Brown, and Boyce.









            [1]           For the
sake of clarity, ExxonMobil=s predecessor
entities, including Humble Oil & Refining Company and Friendswood
Development Company, will be identified throughout this opinion as AExxonMobil.@





            [2]           197
S.W.3d 325 (Tex. 2006).





            [3]           35
S.W.3d 608 (Tex. 2000).





            [4]           951
S.W.2d 401, 408 n.1 (Tex. 1997).





            [5]           Courts
occasionally use the terms Asovereign
immunity@ and Agovernmental
immunity@ interchangeably, although they are two distinct
concepts.  Wichita Falls State Hosp. v. Taylor, 106 S.W.3d 692, 694 n.3
(Tex. 2003).  ASovereign immunity@
refers to the State=s immunity from suit and liability, and its protection
extends to the State and its various divisions of state government.  Id. 
AGovernmental immunity,@ by contrast, protects political subdivisions of the State, including
counties, cities, and school districts.  Id.  The Port is a navigation
district and a political subdivision of the State.  Guillory v. Port of
Houston Auth., 845 S.W.2d 812, 812B13
(Tex. 1993); City of Seabrook v. Port of Houston Auth., 199 S.W.3d 403,
404 (Tex. App.CHouston [1st Dist.] 2006, pet. dism=d). Therefore, we will use the term Agovernmental immunity@ in this opinion.





            [6]           See Tex.
Const. art. III, ' 52; Act of 1927, 40th Leg., R.S., ch. 97, ' 1, 1927 Tex. Gen. Laws 256, 256B57, amended by Act of Apr. 11, 1957, 55th
Leg., R.S., ch. 117, ' 2, 1957 Tex. Gen. Laws 241, 247.





            [7]           See
Tex. Const. art. XVI, ' 59; Act of Apr. 11, 1957, 55th Leg., R.S., ch. 117, ' 2, 1957 Tex. Gen. Laws 241, 247, amended by Act
of May 25, 1987, 70th Leg., R.S., ch. 1042, ' 1,
1987 Tex. Gen. Laws 3506, 3506B07; see also
Tex. Water Code Ann. ' 60.241, et seq. (Vernon 2004) (authorizing
conversion of a district created under article III, section 152, into an
article XVI-section-59 district).





            [8]           The
Thirteenth Court of Appeals recently rejected a similar argument:

 

Rancho first contends that the Easement Agreement at
issue was executed prior to Tooke and that the law as elucidated in Mo.
Pac. therefore controls.  We disagree.  A decision of the supreme court
operates retroactively unless the court exercises its discretion to modify that
application. . . .

. . . .

Immunity was not waived with respect to the claim at
issue prior to September 1, 2005.  Finding no evidence that the supreme court
modified the general rule that its decision in Tooke should be applied
retroactively, we conclude that the Tooke decision does apply to the
instant case and that the words Asue
or be sued@ . . . do not, by themselves, waive governmental
immunity.

 

Valley Mun. Util. Dist. No. 2 v. Rancho Viejo, Inc., No. 13-07-00545-CV, 2008 WL 384320, at *3 (Tex. App.CCorpus Christi Feb. 14, 2008, no pet.) (mem. op.)
(citations omitted).





            [9]           For the
purposes of this appeal, we will assume, without deciding, that the theory of
joint enterprise extends beyond negligence claims to include the Seureaus= fraud and contract allegations.  See Shoemaker v.
Estate of Whistler, 513 S.W.2d 10, 16B17
(Tex. 1974) (adopting Restatement formulation of joint enterprise); Restatement
(Second) of Torts ' 491(1) & cmts. (1965) (imputing responsibility Afor physical harm to other persons caused by the negligence
of any member@) (emphasis added).





            [10]          See
also Act of May 27, 2001, 77th Leg., R.S., ch. 1422, ' 14.11, 2001 Tex. Gen. Laws 5021, 5067. 





            [11]          In
fact, the Legislature has unambiguously stated that, for example, the Tort
Claims Act does not waive immunity for intentional torts.  See Tex.
Civ. Prac. & Rem. Code Ann. '
101.057(2).  Because the Seureaus=
claims are not among those contemplated by the Tort Claims Act, Father contends
that section 101.057 likewise does not proscribe his fraud claims.  However,
the burden is on the plaintiff to demonstrate legislative consent to suit, and
not on the governmental entity to show that such claims are precluded.  See
IT-Davy, 74 S.W.3d at 855.





            [12]          In his
brief, Father contends that the Port and ExxonMobil knew that the original 720
acres would be insufficient to accomplish the Master Plan and had intended to
acquire additional lands; however, these suspicions are not borne out by facts
in the record.





            [13]          Emphasis
added.





            [14]          Allegedly,
in 1966, ExxonMobil presented the Seureaus with a map that incorrectly
identified ExxonMobil as owning several parcels of land that in fact belonged
to the Port.  Had the Seureaus known that the Port owned those properties, they
contend that they would have discovered that ExxonMobil was powerless to
perform its obligations under the Letter Agreement.  For the purpose of this
discussion, however, notwithstanding whatever ExxonMobil may have represented
with respect to its land ownership, the Seureaus have conceded that a review of
the 1964 Basic Agreement would have disclosed ExxonMobil=s inability to control the development of the Bayport
project.





            [15]          To the
extent that ExxonMobil was required to offer to trade the Hollier tract for the
Seureaus= Triangular tract, it would have breached that contractual
duty, if at all, no later than October 27, 1997, by which time it no longer
owned the Hollier tract.